**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| FemHealth USA, Inc., d/b/a carafem, on behalf of itself, its physicians, its staff, and its patients, | ) ) ) ) |
| Plaintiff, | ) Civil Action No. 3:19-cv-01141 ) |
| v. | ) JUDGE RICHARDSON ) |
| City of Mount Juliet; Kenny Martin, City Manager of Mount Juliet, in his official capacity; James Hambrick, Chief of Police of Mount Juliet, in his official capacity; Jennifer Hamblen, Zoning Administrator of Mount Juliet, in her official capacity, | ) MAGISTRATE JUDGE ) NEWBERN ) ) ) ) ) |
| Defendants. | ) |

**FIRST AMENDED COMPLAINT**

Plaintiff FemHealth USA, Inc., d/b/a carafem (hereinafter, "carafem"), on behalf of itself, its physicians and staff, and its patients, by and through counsel, brings this First Amended Complaint against the City of Mount Juliet; Kenny Martin, City Manager of Mount Juliet, in his official capacity; James Hambrick, Chief of Police of Mt. Juliet, in his official capacity; and Jennifer Hamblen, Zoning Administrator of Mt. Juliet, in her official capacity, and in support thereof allege the following:

<u>**PRELIMINARY STATEMENT**</u>

1.      In recent years, Tennessee politicians have engaged in a relentless attack on abortion rights, enacting a multitude of restrictions designed to shutter clinics that have provided

safe and affordable abortion care and imposing unconscionable obstacles on women[1] seeking such care. This lawsuit challenges just such a restriction.

2.     On March 3, 2019, two days after carafem's opening, the Mt. Juliet Board of Commissioners (the "Board") introduced Ordinance 2019-16 (the "Original Ordinance"). The Ordinance plainly targeted carafem, the only abortion clinic within the city limits of Mt. Juliet, and effectively precluded any provider of surgical abortions from operating in Mt. Juliet.

3.     In remarks published in *The Tennessean* on March 1, 2019, City Commissioner Ray Justice, said: "The members of the commission I have talked to are 100 percent behind shutting this abomination down. . . . This is not Mt. Juliet. This is not us."[2] Other officials made comparable public statements.

4.     In January 2020, the Board amended the Original Ordinance, introducing and passing Ordinance 2020-8 (the "Amendment"). However, the Amendment fails to overcome the plain Constitutional infirmities of the Original Ordinance. Instead, it merely identifies several pretextual justifications for barring carafem from meeting the needs of its patients, and continues to impose an undue burden on the right to abortion in Tennessee.

5.     The Original Ordinance, even as amended, does not protect the health, safety, or welfare of Mt. Juliet citizens, and serves no legitimate governmental interest. It simply prohibits

---

[1]  Plaintiff uses "woman" or "women" in this complaint as a short-hand for people who are or may become pregnant, but notes that people of all gender identities, including gender non-conforming people and transgender men, may also become pregnant and seek abortion services and thus also suffer irreparable harm as a result of the Ordinance.

[2]  Andy Humbles, *Mt. Juliet elected officials, religious leaders vow to fight new abortion clinic in city*, NASHVILLE TENNESSEAN (March 1, 2019, 5:03PM), https://www.tennessean.com/story/news/local/wilson/2019/03/01/mt-juliet-abortion-provider-carafem-resistance-city-church/3029532002/.

carafem from providing surgical abortions, in turn unduly burdening Tennesseans attempting to access their constitutional right to abortion.

6.      Plaintiff, the only abortion clinic in Mt. Juliet, brings this lawsuit under 42 U.S.C. § 1983 on behalf of itself, its physicians and staff, and its patients to challenge this restrictive ordinance.  It seeks declaratory and injunctive relief from this unconstitutional law.

## JURISDICTION AND VENUE

7.      This controversy arises out of the Equal Protection Clause and Due Process Clause of the Fourteenth Amendment of the United States Constitution.  Because this action arises under the Constitution and laws of the United States, this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3)-(4).

8.      Plaintiff's claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, Rules 57 and 65 of the Federal Rules of Civil Procedure, and the general legal and equitable powers of this Court.

9.      Venue is proper under 28 U.S.C. § 1391 because Defendants reside in this District and because all acts related to this action occurred within this District.

## PLAINTIFF

10.      Carafem is a 501(c)(3) nonprofit organization registered in the District of Columbia that provides women's reproductive health services.  Carafem operates a network of health centers, including one located in Mt. Juliet, Tennessee, that provide information and low-cost options for people seeking abortion care, as well as most methods of birth control and testing for sexually-transmitted infections.  In addition to its Mt. Juliet location, carafem has clinics located in Atlanta, Georgia; Washington, D.C.; and Chicago, Illinois.

11.     Carafem also brings this action on behalf of its patients, who cannot secure an abortion without the aid of carafem and its physicians. The rights of carafem's patients who seek access to abortion are inextricably bound with carafem's capacity to provide abortion services. Moreover, carafem's patients are and will be unable to assert their own fundamental rights to an abortion, given the extremely short time frame in which to seek an abortion and the desire to protect their privacy, including from potentially abusive partners.

**DEFENDANTS**

12.     The City of Mt. Juliet is a city incorporated in Wilson County, Tennessee. It operates the Mt. Juliet Police Department, employs the individual defendants and has the authority to enforce the Original Ordinance and the Amendment pursuant to Section 6-19-101 of the Uniform City Manager-Commission Charter set forth in chapters 18-29 of Title 6 of the Tennessee Code, and as adopted by Mt. Juliet (hereinafter, the "City Charter").

13.     Kenny Martin is the City Manager of Mt. Juliet and has the authority to enforce the Original Ordinance and the Amendment pursuant to Section 6-21-108 of the City Charter. Mr. Martin is sued in his official capacity.

14.     James Hambrick is the Chief of Police of Mt. Juliet and has the authority to enforce the Original Ordinance and the Amendment pursuant to Section 6-21-602 of the City Charter. Mr. Hambrick is sued in his official capacity.

15.     Jennifer Hamblen is the Zoning Administrator of Mt. Juliet, and has the authority to enforce the Original Ordinance and the Amendment pursuant to Sections 14-101 and 14-108 of the Land Use Code of Mt. Juliet. Ms. Hamblen is sued in her official capacity.

## FACTUAL ALLEGATIONS

### Background on Abortion

16.     Legal abortion is one of the safest procedures in contemporary medical practice and is substantially safer than continuing a pregnancy through to childbirth.  Studies have estimated that the risk of death associated with childbirth nationwide is approximately 14 times higher than that associated with abortion, and every pregnancy-related complication is more common among women giving birth than among those having abortions.[3]

17.     Abortion-related mortality is also lower than that for colonoscopies, plastic surgery, adult tonsillectomies, and a multitude of other outpatient medical procedures.[4]  Abortion is safe and effective (and complications are very rare) regardless of the method of abortion used.[5]

18.     Legal abortion is not only extremely safe but also common; approximately one in four women in this country will have an abortion by age 45.[6]

19.     Individuals seek abortion for a multitude of complicated and personal reasons that are closely tied to each person's values, culture and religion, health and reproductive history, family situation and support system, educational or career goals, and resources and financial stability.

---

[3]  *See* Elizabeth G. Raymond & David A. Grimes, *The Comparative Safety of Legal Induced Abortion and Childbirth in the United States*, 119 Obstetrics & Gynecology 215, 215 (2012).

[4]  Ushma Upadhyay et al., *Incidence of Emergency Department Visits and Complications After Abortion*, 125 Obstetrics & Gynecology 175, 175 (2015).

[5]  *Id.*

[6]  *See* News Release, Guttmacher Inst., *Fact Sheet: Abortion Is a Common Experience for U.S. Women, Despite Dramatic Declines in Rates* (Oct. 19, 2017), https://www.guttmacher.org/ /2017/abortion-commonexperience-us-women-despite-dramatic-declines-rates.

- 5 -

20.     Some patients have abortions because they conclude that it is not the right time to become a parent given their age, desire to pursue their education or career, or because they lack the necessary financial resources or level of familial or partner support or stability.

21.     Others are already parents; indeed, a majority of abortion patients in the United States already have at least one child.[7]  These individuals may already be struggling to adequately provide for their existing children—both materially and emotionally—and may be concerned about their ability to do so if they add another child to their family.  That strain is all the more apparent if one considers that the vast majority—approximately 75%—of abortion patients nationwide are poor or low-income.[8]  That is true at carafem as well, where a significant percentage of patients qualify for need-based financial assistance.

22.     In the first trimester of pregnancy, two abortion methods are available.  First, a pregnancy can be terminated using medication.  In a medication abortion, which is available only up to 10–11 weeks from the last menstrual period ("LMP"), the patient ingests two medications to induce an early miscarriage.  The patient ingests the first medication, mifepristone, at the clinic, and takes the second medication, misoprostol, at home 24 to 48 hours later.

23.     The other first-trimester abortion method is a surgical or vacuum aspiration abortion.  Aspiration abortion involves the use of gentle suction to empty the contents of the uterus.  The procedure takes between five and ten minutes to complete and, like medication abortion, is

---

[7] *See* Guttmacher Inst., *Induced Abortions in the United States* at 1 (Sept. 2019), https://www.guttmacher.org/sites/default/ files/factsheet/fb_induced_abortion.pdf; *see also* Jenna Jerman, Rachel K. Jones & Tsuyoshi Onda, Guttmacher Inst., *Characteristics of U.S. Abortion Patients in 2014 and Changes Since 2008*, at 6, 7 (May 2016), https://www.guttmacher.org/sites/default/files/report_pdf/characteristics-us-abortion-patients-2014.pdf.

[8] Guttmacher Inst., *Induced Abortions in the United States* at 1 (Sept. 2019), https://www.guttmacher.org/sites/default/ files/factsheet/fb_induced_abortion.pdf.

extremely safe. Although sometimes referred to as "surgical abortion," aspiration abortion does not involve any incision.

24. Medication and aspiration abortion are both common medical procedures, with aspiration being the more prevalent of the two.

25. For patients who are candidates for either medication or aspiration abortion, the choice between the two methods is a matter of patient preference, in conjunction with the recommendations of the clinician.

26. However, some patients are not candidates for medication abortion. For one thing, medication abortion is available only up to 10–11 weeks LMP, while aspiration abortion can be performed after that point. Moreover, patients with various medical conditions—including bleeding disorders; certain heart or blood vessel diseases; severe liver, kidney or lung disease; an uncontrolled seizure disorder; or patients who are taking blood thinners or steroid medications— are not candidates for medication abortion. And because a medication abortion requires the patient to pass the pregnancy at home over an uncertain period of time, certain patients—including those with caregiving responsibilities at home and some patients at risk for domestic violence—are more appropriate candidates for aspiration abortion.

Carafem Opens Its Doors in Mt. Juliet

27. Carafem operates a network of health centers, including in Atlanta, Georgia; Washington, D.C.; and Chicago, Illinois. These clinics provide a variety of reproductive healthcare services, including abortion care; most methods of birth control; and testing for sexually-transmitted infections.

28. In the months before it opened the Mt. Juliet clinic, carafem regularly saw women from Tennessee travel to its Atlanta, Georgia facility for abortion services. This is because access

- 7 -

to abortion services is limited in Tennessee and in the Nashville metropolitan area in particular. Before the Mt. Juliet clinic opened, there was just one abortion clinic in the area—a Planned Parenthood health center in Nashville. As carafem learned in 2018, this clinic could not and does not meet the needs of all individuals seeking abortion. Indeed, the Planned Parenthood-Nashville clinic was unable to offer abortion services at all for several months in early 2019 due to apparent staffing limitations. Even when abortion services were available, it could not meet the needs of all patients seeking abortion care, with patients waiting weeks for an appointment. Many of these patients were forced to travel elsewhere for abortion services, including to carafem's clinic in Atlanta.

29. To better serve these patients, carafem decided to open a new facility in the Nashville metro area. Carafem identified a location for its new facility in a commercial area of Mt. Juliet, in the Providence Medical Pavilion, which leases medical office space to several health care providers and specialists.

30. The Providence Medical Pavilion houses several other medical clinics in addition to carafem, including: The Allergy, Asthma and Sinus Center; Alberto Cadeno, OB/GYN; Comprehensive Pain Specialists; Oxford Orthodontics; Premier Radiology; Providence Surgery Center; Results Physiotherapy; TN Maternal Fetal Medicine; Vanderbilt Neurosurgery; and Vanderbilt Orthopaedics.

31. Providence Medical Pavilion is located in a commercial interchange ("CI") zoning district. Under Mt. Juliet's Land Development Code (the "Development Code"), "professional services, medical" is a permitted use in CI districts. According to Development Code, Art. III, § 3-103.3 (12), "[p]rofessional services, medical" includes various types of physicians' offices and clinics, dental offices, optometrists, and outpatient medical service facilities.

- 8 -

32. Carafem's Mt. Juliet location opened on March 1, 2019, providing medication abortion to women up to 10 weeks from LMP, as well as birth control options and emergency contraception.[9] Within 48 hours of opening, carafem was completely booked for the next 30 days.

33. While carafem offered medication abortion services in the days after the Mt. Juliet clinic opened, it planned to expand its services to include surgical abortion shortly thereafter, in order to better meet the needs of its patients. Carafem announced these plans publicly in a press release dated February 28, 2019.[10]

## Passage of the Original Ordinance

34. Shortly after carafem's opening, several members of the Board and other city officials made public statements expressing their opposition to carafem's opening and explicitly stating that they would act to prevent carafem from providing abortion services.

35. City Commissioner Brian Abston, in remarks published in *The Tennessean* on March 1, 2019, said: "I was disgusted to hear they plan to open in my district and my town. . . . If there is anything we can legally do to keep them from opening in Mt. Juliet we will do it."[11]

36. In a statement provided to NewsChannel 5, Commissioner Abston stated: "I was disgusted to hear they plan to open in my district and my town. . . . I realize they have rights, but

---

[9] Carafem has since expanded its services to offer medication abortion up to 11 weeks from LMP.

[10] *Carafem Opens Doors in the Nashville, Tennessee Area*, carafem website, (February 28, 2019), https://carafem.org/carafem-opens-doors-nashville-tennessee-area/.

[11] Andy Humbles, *Mt. Juliet elected officials, religious leaders vow to fight new abortion clinic in city*, NASHVILLE TENNESSEAN (March 1, 2019, 5:03PM), https://www.tennessean.com/story/news/local/wilson/2019/03/01/mt-juliet-abortion-provider-carafem-resistance-city-church/3029532002/.

my constituents and I don't want it here. I am pro-life so I will take any action possible within the law to make sure it's not here."[12]

37. City Commissioner Ray Justice, in remarks published in *The Tennessean* on March 1, 2019, said: "The members of the commission I have talked to are 100 percent behind shutting this abomination down. . . This is not Mt. Juliet. This is not us."[13]

38. In a posting on Facebook, Commissioner Justice also stated that the Board of Commissioners would pursue ways to close carafem's clinic:

> The City of Mt. Juliet did not approve an abortion clinic in our city! . . . We are pursuing every possible legal option to stop this "organization" from being in Mt. Juliet. To a man, our city commission is Christian Conservative and will not just "let this happen" without fighting.[14]

39. City Commissioner and Vice Mayor James Maness, sharing his opposition to carafem's opening, stated on his Facebook page and his blog:

> I am pro-life. The taking of innocent life is called murder. Abortion is not a matter of choice, it's a matter of life and how we value life.[15]

---

[12] Laurie Everett, *MJ moves to stop abortion clinic*, THE WILSON POST (March 6, 2019), https://www.wilsonpost.com/community/mj-moves-to-stop-abortion-clinic/article_3748b5ca-3fd5-11e9-acee-bba608f35793.html.

[13] Andy Humbles, *Mt. Juliet elected officials, religious leaders vow to fight new abortion clinic in city*, NASHVILLE TENNESSEAN (March 1, 2019, 5:03PM), https://www.tennessean.com/story/news/local/wilson/2019/03/01/mt-juliet-abortion-provider-carafem-resistance-city-church/3029532002/.

[14] Ray Justice City of Mt. Juliet Commissioner District 1, Facebook Post (March 1, 2019), https://www.facebook.com/mjcommishd1/posts/1527848127352459.

[15] James Maness, Facebook Post (March 1, 2019), https://www.facebook.com/jm4mj/?ref=py_c. *See also*, James Maness, Mt. Juliet Abortion Clinic Blog Post (March 1, 2019, 1:04PM), https://www.jamesmaness.com/mt_juliet_abortion_clinic.

- 10 -

40.     Mayor Hagerty also reportedly voiced his opposition to carafem in an open letter to supporters that was later published on the blog Left-Handed Conservative, stating:

> I too am pro-life. . . .  I am guessing most if not all on this email feel the same.  Candidly, I am embarrassed and disgusted that this happened on my watch.  If I had the power to stop it, I would have done so.[16]

41.     Consistent with these public statements, the Mt. Juliet Board of Commissioners announced a special meeting for Sunday, March 3, 2019, two days after carafem's opening.

42.     The only item on the agenda for the special meeting was the first reading of the Original Ordinance:  an amendment to the zoning ordinances that effectively prohibited the provision of surgical abortion services anywhere within the city.

43.     The Board convened the special meeting on March 3, 2019, to consider the Original Ordinance.  Mayor Hagerty also attended the special meeting.  All four members of the Board voted in favor of the Original Ordinance.  A video recording of the meeting posted on the Mt. Juliet website shows the entire meeting lasted less than five minutes.

44.     After review and approval by the Mt. Juliet Planning Commission on March 21, 2019, the Board unanimously approved the Original Ordinance on April 8, 2019.

45.     At each of these meetings, officials made no statements regarding the purpose or intent of the Original Ordinance apart from the self-evident purpose of blocking access to abortion, heard no public comments or evidence regarding any constitutionally permissible benefits that would be promoted by the Original Ordinance, and introduced no other testimony or other evidence that supported the passage of the Original Ordinance.

---

[16] Lefty, *Under cover of darkness,* Left-handed Conservative (March 4, 2019), https://lefthandedconservative.wordpress.com/2019/03/04/under-cover-of-darkness/.

46.     The Original Ordinance amended Part B of the Unified Development Code of the City of Mt. Juliet, including by amending Articles 2-103.3, Definition, Commercial Activities; 3-102(C), Listing of Activity Types for Commercial Activities; 3-103.3, Commercial Activities-Class and Types; 3-104.7, Provisions Applicable to Commercial Activities; Table 7-102A, Permitted and Conditional Uses and Structures Allowable within Industrial Districts to include Surgical Abortion Clinics.  A true and correct copy of the Original Ordinance is attached hereto as Exhibit A.

47.     The Original Ordinance amends Section 2-103.3 of the Development Code to define "Surgical Abortion Clinics" as:

> any entity, place or building in which surgical activity is primarily conducted or aimed toward terminating pregnancy, otherwise known as abortion as defined at Tenn. Code Ann. § 39-15-201.

48.     The Original Ordinance limits Surgical Abortion Clinics to be a permitted use with supplemental provisions ("SUP") in industrial zones I-G and I-S.  Table 7-102A.  A SUP is defined in Section 7-102.3:

> A use permitted with supplemental provisions is an activity, use or structure which is permitted subject to a finding by the Zoning Administrator that the specific standards indicated for the use in question have been met.  Only those uses and structures so indicated in table 7-102A, may be allowed within the districts indicated.

49.     The Original Ordinance further restricted the locations in which Surgical Abortion Clinics may be located by amending Section 3-104.7 to state that no such Surgical Abortion Clinic:

> shall be located within 1,000 feet (measured property line to property line) of any church, public or private school ground, college campus, public park or recreation facility, public library, child care facilities, or a lot zoned residentially or devoted primarily to residential use.

50.     Because of the specific restrictions set forth in the Original Ordinance, at the time of its passage there was no land in Mt. Juliet where a Surgical Abortion Clinic could be located.

- 12 -

There is no land in Mt. Juliet zoned I-S. There are only two areas in Mt. Juliet currently zoned I-G,[17] each of which were unfit for a Surgical Abortion Clinic because they were surrounded by land zoned for residential use and/or located within 1000 feet from a church.

51.     Thus, in purpose and effect, the Original Ordinance was a complete ban on Surgical Abortion Clinics within the city limits of Mt. Juliet.

52.     After the passage of the Original Ordinance, carafem explored its legal options, including seeking consent from Mt. Juliet to be grandfathered in under the previous zoning ordinances. Mt. Juliet rejected those efforts.

53.     Carafem currently has the personnel, facilities, equipment, and expertise to provide surgical abortions at its Mt. Juliet clinic. But for the Original Ordinance, carafem would currently be providing surgical abortion services.

<u>Passage of the Amendment</u>

54.     On December 18, 2019, carafem initiated the present litigation, filing its Complaint as well as a Motion for Preliminary Injunction. (D.I. 1, 4.) Shortly thereafter – before responding to either pleading, and without providing any notice to carafem – Defendants introduced the Amendment. When carafem learned that the Amendment had been introduced, carafem's counsel promptly reached out to Defendants' counsel to know whether they were aware of it and when it would be formally passed.

55.     Defendants' counsel had been aware of the Amendment without notifying carafem or its counsel. They subsequently advised carafem that the Amendment would be put forth for a second reading on February 10, 2020.

---

[17] City of Mt. Juliet, Tennessee, Official Zoning Map, https://www.mtjuliet-tn.gov/DocumentCenter/View/82/Zoning-Map-PDF.

- 13 -

56.     The Amendment acknowledges that the Original Ordinance, as passed, "was constitutionally problematic."[18]  However, the Amendment states that "the city leaders believed that the ordinance adopted—for the purpose of promoting the health, safety and welfare of not only those seeking to utilize the services of a surgical abortion clinic but also to preserve the City's economic growth and shift protests to a less densely populated area—was constitutional."[19]

57.     The Amendment was first advanced during a January 13, 2020 meeting of the Board of Commissioners.  During this meeting, the Amendment was unanimously passed as a "consent resolution," bypassing any public discussion, explanation, or debate among the Board. The first and second readings of the Amendment, in meetings held on January 16, 2020 and February 10, 2020, also proceeded as a consent resolution.  Thus, at no point during the passage of either the Original Ordinance or the Amendment did the Board of Commissioners publicly discuss or debate either bill, hear or introduce any evidence, offer any statements on the record, or make any legislative findings as to the purpose or intended effect as to the Original Ordinance.

58.     The Amendment modifies the Original Ordinance to theoretically permit Surgical Abortion Clinics in certain I-G zoned areas in Mt. Juliet.  Specifically, the Amendment adds the bolded and underlined language, and removes the struck language below.

---

[18] *See* Amendment.

[19] *Id.*

- 14 -

No establishment shall be located within ~~1000~~ **200** feet ~~(measured property line to property line)~~ of any church, public or private school, college ~~campus~~, public park or **public** recreation facility, public library, child care facility**, or a single family residential home. Distance will be measured along the shortest drivable route from the center of the main entrance (i.e. front door) of one location to the center of the main entrance (i.e. front door) of the other location. After permitting of the establishment, any protected use that comes within the protected area of the establishment will not affect the establishment's ability to continue operations**.[20]

A true and correct copy of the Amendment is attached hereto as Exhibit B.

59.     Despite the Amendment appearing to loosen the restrictions on surgical abortions, carafem is still unable to perform surgical abortions at its current facility in Mt. Juliet, because it continues to restrict the location of Surgical Abortion Clinics to areas zoned I-S and I-G.

60.     There is no land in Mt. Juliet zoned I-S.  There are only two small areas in Mt. Juliet currently zoned I-G.[21]

61.     The first area of land zoned I-G is located near the intersection of Golden Bear Gateway and East Division Street, as shown on the zoning map below in Figure 1.

---

[20] *See* Amendment.

[21] City of Mt. Juliet, Tennessee, Official Zoning Map, https://www.mtjuliet-tn.gov/DocumentCenter/View/82/Zoning-Map-PDF.

- 15 -



**Figure 1. Excerpt of Mt. Juliet Zoning Map[22]**

62.     Most of this I-G zone is surrounded by land zoned for RS-40, Single Family Residential use.   Moreover, this I-G zone appears to be largely undeveloped land.  Thus, building a new medical facility on this lot would be cost-prohibitive.

63.     The second I-G zoned district is located near the Main Street District, around Industrial Drive and East Division Street, shown in dark gray in the zoning map below:

---

[22] City of Mt. Juliet, Tennessee, Official Zoning Map, https://www.mtjuliet-tn.gov/DocumentCenter/View/82/Zoning-Map-PDF.

- 16 -



**Figure 2. Excerpt of Mt. Juliet Zoning Map[23]**

64. This I-G zoned district abuts area zoned RS-15, Single-Family Residential Use, and RM-8, Multifamily Residential Use, and is located close to a district zoned RS-40, Single Family Residential Use.

---

[23] City of Mt. Juliet, Tennessee, Official Zoning Map, https://www.mtjuliet-tn.gov/DocumentCenter/View/82/Zoning-Map-PDF.

65.     No medical office space exists in this second I-G zone. Even if it were, carafem has a lease for its current office space that does not expire for more than a year. Even if any suitable office space were available, it is also unclear that carafem would be able to rent it, particularly given the difficulty carafem has faced in finding a landlord in Mt. Juliet willing to lease it space. Further, carafem has already expended significant resources developing its current office space and marketing its location, and it would be infeasible for carafem to undergo the expenses of moving and appropriately fitting a second office.

The Original Ordinance Was Enacted with the Impermissible Purpose of Blocking Abortions

66.     The purpose of the Original Ordinance was to unduly burden Mt. Juliet women seeking an abortion and to hinder women's free choice. As the contemporaneous statements of the officials who enacted the Original Ordinance make clear, the sole purpose of the Original Ordinance was to block access to abortion in Mt. Juliet, and the Amendment does not mollify that impermissible purpose. Indeed, the day after carafem announced its intentions to provide surgical abortions at its Mt. Juliet clinic, city commissioners announced their intention "to stop this 'organization' from being in Mt. Juliet."

67.     The Original Ordinance's operation in practice confirms its purpose by relegating the provision of surgical abortion to two small areas of land in the city of Mt. Juliet, one of which appears to be a vacant plot. Even under the Amendment, Carafem is barred from offering surgical abortions at its Mt. Juliet facility, which is the very intent of the Original Ordinance.

The Purported Justifications for the Original Ordinance are Merely Pretextual

68.     The Amendment attempts to overcome the necessary conclusion that enacting the Original Ordinance was motivated solely by animus against carafem's abortion services by the

- 18 -

Board by advancing three purported justifications for the Amendment. Each of these are clearly unavailing.

69.   First, the Amendment asserts that the Original Ordinance was enacted "for the purpose of promoting the health, safety and welfare of … those seeking to utilize the services of a surgical abortion clinic." However, the Original Ordinance does not further any interest in patient health or safety, because surgical abortion is an extremely safe medical procedure.

70.   The rate of major complications from abortion is similar to the rate of major complications from colonoscopy (0.24%), another minimally invasive procedure. The overall abortion complication rate is lower than that for wisdom tooth extraction, which is nearly 7%, according to one study. The overall abortion complication rate is also lower than that for tonsillectomy, which is around 8-9%.[24]

71.   Abortion is also far safer than the alternative—carrying a pregnancy to term. Almost 29% of hospital deliveries involve at least one obstetric complication. The major complication rate for hospital deliveries is 1.3%. As a result, denying a woman who wants to have an abortion access to legal abortion services does not benefit her health.[25]

72.   Moreover, by prohibiting surgical abortion clinics from operating within a medical facility, and relegating them to industrially-zoned districts, the Original Ordinance is incompatible with an intended goal of advancing public health and safety.

73.   Second, the Amendment asserts that the Original Ordinance was adopted "to preserve the City's economic growth." However, it provides no explanation as to how carafem's presence in its current medical office could harm the economic growth of the City. Plainly, there

---

[24] ANSIRH, Issue Brief #6 Safety of abortion in the United States (Dec. 2014).

[25] ANSIRH, Issue Brief #6 Safety of abortion in the United States (Dec. 2014).

can be no legitimate argument that the provision of surgical abortion services at carafem's Mt. Juliet facility in any way affects the economic development of the City to justify a total prohibition on that procedure.

74.    Third, the Amendment contends that another purpose of the Original Ordinance was to "shift protests to a less densely populated area."  But this purported justification also fails to advance any legitimate governmental interest.

75.    Because carafem continues to perform medication abortions at its Mt. Juliet facility, it has been the target of protests from anti-abortion advocates in the community.  Protests began before carafem ever opened for business.  These protests persist even though carafem has never offered surgical abortion in Mt. Juliet..

76.    There is  no evidence that, if carafem could perform surgical abortions at its current office location, protests would meaningfully increase, or that protests would decrease if carafem relocated to an I-G district.

77.    Additionally, the Providence Medical Pavilion is located in a commercial district, on a commercial street, surrounded only by other medical and professional facilities, a Hampton Inn and Suites hotel, and a vacant lot.  The protests at this location thus have not disrupted the ongoing commercial activity in the area.   In any event, the Original Ordinance cannot constitutionally provide a "heckler's veto" to those opposed to abortion rights.  Indeed, under the Board's proffered justification, an anti-Semitic protest outside of a synagogue would allow the Board to force the *synagogue* to move to a "less densely populated area."

78.    Because Defendants have failed to advance any cognizable or legitimate basis for the Original Ordinance, it is clear that the principal purpose of the Original Ordinance was and is

- 20 -

to restrict abortion access. It burdens a constitutional right with no constitutionally permissible reason and is therefore invalid.

<u>The Original Ordinance Creates An Undue Burden On Women Seeking Abortion Care</u>

79.     By preventing carafem from offering surgical abortions at its Mt. Juliet facility, the Original Ordinance is unduly burdensome to all patients seeking such procedures.

80.     Currently, there is only one provider of surgical abortions in the Nashville, TN metropolitan area: Nashville Health Center, which is operated by Planned Parenthood of Tennessee and North Mississippi (hereinafter, "Planned Parenthood-Nashville"). In December 2018, Planned Parenthood-Nashville stopped offering any abortion services at that location, reportedly due to staffing difficulties. Although abortion services resumed at that location in March 2019, availability is intermittent, and at best there are lengthy wait times of two to three weeks for abortion services due to capacity constraints.

81.     These wait times were discussed at length in recent litigation involving Planned Parenthood-Nashville; the testimony indicated that patients seeking to schedule an abortion at the clinic would have to wait one to three weeks for their first visit and an additional two to six days for their second appointment if they were having a medication abortion, or over a week for their second appointment if they were having a surgical abortion.[26] For some patients, that delay would be as long as six weeks from the initial request to the scheduling of the abortion.[27]

82.     Due to capacity constraints and wait times at Planned Parenthood-Nashville, patients are faced with the prospect of traveling hundreds of miles round-trip to obtain surgical

---

[26] Trial Transcript Vol. 2 at 97:1-24, *Adams & Boyle P.C. v. Slatery*, No. 3:15-cv-00705 (M.D. Tenn. Sept. 24, 2019).

[27] *Id.*

abortion services at another clinic. Indeed, during the period in which Planned Parenthood stopped providing abortion services in Nashville, carafem saw a significant increase in the number of clients making the long, burdensome journey from Tennessee to carafem's Atlanta facility to seek abortion care. During January 2019, carafem found that 5% of women coming to its Atlanta location were from Tennessee.

83.     Such lengthy inter-city travel subjects women to burdensome expenses, including expenses associated with transportation and lodging. This travel requirement is burdensome for anyone, but particularly for low-income women, who are disproportionately likely to be seeking abortion services. For poor and low-income women, the inter-city travel that is now required to seek an abortion delays numerous women in seeking an abortion, and prevents others from being able to obtain an abortion altogether.

84.     Indeed, women who travel to other abortion providers face burdensome expenses, including gas or bus fare, lodging expenses, childcare expenses, and lost wages due to time away from work. Many women may not be able to afford such a trip. Women who make these lengthy trips also face personal burdens, such as a loss of confidentiality. For instance, some women in abusive relationships may be unable to leave for the day or more that such travel requires without revealing their intent to have an abortion, particularly if their partners are aware that the women are pregnant. Such women may be subjected to an increased risk of violence and abuse in these circumstances.

85.     The burdens women face as a result of the Original Ordinance are compounded by other obstacles to abortion access in Tennessee law. For example, Tennessee law prohibits many private health insurance plans from providing abortion coverage—including for medically necessary procedures, *see* Tenn. Code Ann. § 56-26-134, and also limits abortion coverage in

- 22 -

public health insurance plans, *see* Tenn. Code Ann. § 9-4-5116. Further, Tennessee law requires a woman seeking an abortion to make two trips to a clinic, *see* Tenn. Code Ann. § 39-15-202(b), (d)(1). The first visit is for in-person counseling by a doctor. The woman then must wait at least 48 hours before returning for an abortion.

86.    The delays in abortion access caused by the Original Ordinance subject patients to increased medical risk. Although abortion is safe throughout pregnancy—and safer than many other common medical procedures—both the risk of complications and the cost of the procedure increase with gestational age.

87.    As such, the Original Ordinance imposes substantial burdens that are not justified by any legitimate governmental interest.

88.    Because the Original Ordinance has both the impermissible purpose and effect of imposing an undue burden on abortion access, the Original Ordinance is unconstitutional.

The Original Ordinance Denies carafem and Its Patients Equal Protection Under the Law

89.    There is no legitimate basis for the Original Ordinance, which distinguishes between surgical abortions—by relegating providers to a small handful of specially-zoned areas in Mt. Juliet—and the numerous comparable medical procedures that are unaffected by the Original Ordinance.

90.    Despite the safety of surgical abortion, the Original Ordinance singles it out from other medical procedures and treats providers of surgical abortion disparately as compared to similarly situated medical practitioners. Specifically, providers of surgical abortion are precluded from operating almost anywhere in the city of Mt. Juliet whereas other medical services and outpatient surgery providers are unaffected.

- 23 -

91.     While the Original Ordinance prevents practitioners from offering surgical abortion procedures within CI-zoned districts, other outpatient surgical procedures are performed in the very same building as carafem's Mt. Juliet Office.  Indeed, the Providence Medical Pavilion, where carafem is currently located, houses several other facilities, including Providence Surgery Center, which performs a variety of cardiac, ENT, orthopedic, pain, and podiatry outpatient surgical procedures, some which may involve the use of sedation or anesthesia and be even more invasive, and carry greater risks of complication, than surgical abortion.[28]  The Original Ordinance did not affect any other medical service provider but carafem in the Providence Medical Pavilion, including those that provide surgical services.

92.     The city has failed to identify any legitimate "compelling reason" for the Original Ordinance —or any legitimate basis whatsoever.  At none of the six meetings required to pass both the Original Ordinance and the Amendment did the Board introduce or hear any evidence as to the purpose of the Original Ordinance, nor has it ever described any non-pretextual ends—apart from reducing the availability of abortion—it sought to achieve.

93.     The disparate treatment of providers of surgical abortion by the Original Ordinance is not related to and does not further any valid government interest, nor is it narrowly tailored to further a compelling government interest.  For the reasons stated above, the purported justifications identified in the Amendment are not legitimate or compelling state interests and are unsupported by any evidence, and the Original Ordinance will not achieve those stated goals.

94.     The Original Ordinance was the product of ill will and animus against abortion providers and patients.

---

[28] Providence Surgery Center, *About Us,* http://providenceasc.com/about-us (last accessed November 12, 2019).

95.     The Board knew that passing the Original Ordinance would have the purpose and effect of prohibiting carafem from offering surgical abortions at its Mt. Juliet facility, a purpose and effect that are not affected by the Amendment.  The Board of Commissioners passed the Original Ordinance with the intent of making abortion less accessible and less affordable for Mt. Juliet women.

96.     With nothing but opposition to abortion purporting to justify this discriminatory treatment, the Original Ordinance denies carafem equal protection under the law and is unconstitutional as a result.

    The Original Ordinance Is Arbitrary, Capricious, and Lacks Any Rational Basis

97.     The Original Ordinance is arbitrary, capricious, and not rationally related to a legitimate public purpose.  The Original Ordinance impermissibly targets surgical abortion providers, and fails to actually promote any interest in the health, safety, morals, convenience, order, prosperity, and welfare of Mt. Juliet citizens.

    Carafem and Its Patients Are Being Irreparably Harmed by the Original Ordinance

98.     The Original Ordinance has irreparably harmed carafem's patients, and will continue to do so each and every day it remains in effect.  Since the Original Ordinance was enacted, carafem has been forced to turn away women seeking aspiration abortion services who are not eligible for medication abortion, including all women past 11 weeks of pregnancy and those with contraindications to medication abortion.

99.     In fact, in the less than three months since carafem filed its original Complaint and Motion for Preliminary Injunction in this case, it has had to turn away patients seeking surgical abortion.

100.    Denying these women access to time-sensitive medical care causes them irreparable injury.  There is just one other abortion clinic in the Nashville metropolitan area, and its limited capacity means that women seeking aspiration abortion at a minimum incur a lengthy wait time of 2-3 weeks or greater, and some are unable to get an appointment at all.

101.    While abortion is a very safe procedure, such unwanted delay subjects patients to increased medical risks.

102.    Women unable to obtain abortions in the Nashville area face the prospect of traveling hundreds of miles round-trip to the next-closest clinics—and doing so twice (or securing lodging for a multiple-night stay) if the clinic is in a state like Tennessee that mandates multiple in-person visits to the clinic at least 48 hours apart.

103.    Many women seeking carafem's services are low-income, and for many poor women struggling to make ends meet, financial and logistical challenges make such travel difficult or impossible, and, at a minimum, result in delayed access to care.

104.    The Original Ordinance deprives women of their constitutional right to abortion, and will continue to cause irreparable injury absent relief from this Court.

105.    Plaintiff has no adequate remedy at law.

## CAUSES OF ACTION

## COUNT 1 – SUBSTANTIVE DUE PROCESS: UNCONSTITUTIONAL PURPOSE OF IMPOSING AN UNDUE BURDEN

106.    The allegations of the foregoing paragraphs are incorporated as though fully set forth herein.

107.    The Original Ordinance and Amendment were enacted for the purpose of imposing an undue burden on women seeking a surgical abortion in Mt. Juliet.

- 26 -

108.     Therefore, the Original Ordinance and Amendment violate the Due Process Clause of the Fourteenth Amendment and are invalid.

## COUNT 2 – SUBSTANTIVE DUE PROCESS: UNCONSTITUTIONAL EFFECT OF IMPOSING AN UNDUE BURDEN

109.     The allegations of the foregoing paragraphs are incorporated as though fully set forth herein.

110.     The Original Ordinance and Amendment have the effect of imposing an undue burden on women seeking a surgical abortion in Mt. Juliet.

111.     Therefore, the Original Ordinance and Amendment violate the Due Process Clause of the Fourteenth Amendment and are invalid.

## COUNT 3 – EQUAL PROTECTION

112.     The allegations of the foregoing paragraphs are incorporated as though fully set forth herein.

113.     The Original Ordinance and Amendment deny equal protection of the laws to Plaintiff and its patients in violation of the Equal Protection Clause of the Fourteenth Amendment.

## COUNT 4 – SUBSTANTIVE DUE PROCESS: ARBITRARY ZONING DECISION

114.     The allegations of the foregoing paragraphs are incorporated as though fully set forth herein.

115.     The Original Ordinance and Amendment are arbitrary, unreasonable, capricious, and discriminatory zoning regulations that lack any substantial relationship to the public health, safety, morals, or general welfare.  The Ordinance and Amendment violate both the Due Process Clause of the Fourteenth Amendment and Article I, Section 8 of the Tennessee Constitution, and is invalid.

- 27 -

WHEREFORE, as a result of the foregoing, Plaintiff would respectfully request that this Honorable Court award a judgment to Plaintiff as follows:

A.    Issue a declaratory judgment that the Original Ordinance and Amendment are unconstitutional and unenforceable on their face;

B.    Preliminarily enjoin Defendants and their employees, agents, and successors in office from enforcing the Original Ordinance or the Amendment;

C.    Permanently enjoin Defendants and their employees, agents, and successors in office from enforcing the Original Ordinance or the Amendment;

D.    Grant Plaintiff attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and/or

E.    Grant such other and further relief as this Court may deem just, proper and equitable.


Respectfully submitted,


/s/Thomas H. Castelli
Thomas H. Castelli, BPR#024849
Legal Director
ACLU Foundation of Tennessee
P.O. Box 120160
Nashville, TN 37212
Tel.: 615-320-7142
tcastelli@aclu-tn.org


Andrew D. Beck*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street
New York, NY 10004
Tel.: 212-549-2633
abeck@aclu.org

- 28 -

Elizabeth P. Gray*
Heather M. Schneider*
Tara L. Thieme*
Vanessa Richardson*
Devon W. Edwards*
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019-6099
hschneider@willkie.com
(212) 728-8187
(212) 728-9187 *Facsimile*

*Admitted pro hac vice*

*Attorneys for carafem*

- 29 -

<u>**CERTIFICATE OF SERVICE**</u>

I, the undersigned, do hereby certify that a true and correct copy of the foregoing *First Amended Complaint* has been served via the Court's electronic filing system on the following parties on the 13th day of February 2020:

Cassandra M. Crane
Kristin Ellis Berexa
Mark Ennis McGrady
FARRAR & BATES LLP
211 Seventh Ave., North, Suite 500
Nashville, TN 37219
(615) 254-3060
casey.crane@farrar-bates.com
kristin.berexa@farrar-bates.com
mark.mcgrady@farrar-bates.com

<u>*/s/*Thomas H. Castelli</u>
Thomas H. Castelli

- 30 -