IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

FEMHEALTH USA, INC.,⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀Plaintiff,⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀No. 3:19-cv-01141
v.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀JUDGE RICHARDSON
CITY OF MOUNT JULIET, et al.,⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀Defendants.⠀⠀⠀⠀⠀⠀⠀)

**MEMORANDUM OPINION**

Pending before the Court is Plaintiff FemHealth USA, Inc. d/b/a carafem ("Carafem")'s Amended Motion for Preliminary Injunction (the "Motion"), filed on February 13, 2020. (Doc. No. 37). Via the Motion, Plaintiff requests that the Court preliminarily enjoin Defendants, the City of Mt. Juliet ("Mt. Juliet" or the "City") and the named City officials sued in their official capacity, from enforcing Ordinances 2019-16 (the "Ordinance") and 2020-8 (the "Amendment"), which prevent Plaintiff from performing surgical abortions in its current location. Defendants responded in opposition to the Motion, (Doc. No. 43), and Carafem replied. (Doc. No. 50). The parties mutually agreed that the Motion may be decided on the briefing without an evidentiary hearing. (Doc. No. 40). The Court likewise agrees, having considered the Motion, its accompanying memorandum of law and the attachments thereto (Doc. Nos. 37 & 38), Defendants' response, and Defendants' declarations filed simultaneously with their response. For the reasons discussed below, Carafem's Amended Motion for Preliminary Injunction will be granted.

1

## BACKGROUND[1]

Carafem is a nonprofit organization that offers women's reproductive health services, including information and low-cost options for people seeking abortion care, methods of birth control, and testing for sexually-transmitted infections. Carafem operates a network of health centers, including the clinic in Mt. Juliet, Tennessee at issue here.[2] The Mt. Juliet Carafem is located in the Providence Medical Pavilion, a commercial property which leases medical office space to several health care providers and specialists. The Providence Medical Pavilion houses several other medical clinics in addition to Carafem, including *inter alia* multiple obstetrics and gynecology offices, an ambulatory surgery center, and a neurosurgery suite.

When Carafem opened its doors in Mt. Juliet on March 1, 2019, it became the only abortion clinic within the city limits of Mt. Juliet, Tennessee.[3] At that time, Carafem provided medication

---

[1] The following facts, except to the extent somehow qualified herein, are taken as true for purposes of the Motion, because they are either: (1) asserted and evidentially supported at least to some degree by one party and not rebutted by the other side; (2) otherwise not in genuine dispute; (3) asserted and evidentially supported by one side to such an extent, or in such a manner, that they are credited by this Court even if rebutted to some extent by the other side; or (4) subject to judicial notice. At times herein, the Court will use terms that some may view as euphemisms intended to unduly sanitize the matters being discussed. Where the Court does so, it generally does so because: (a) Plaintiff chose to use them, and the Court typically defers to a plaintiff's word choices at least at this stage of the proceedings; and (b) because the Court understands what the applicable term is referring to, even if Plaintiff conceivably could have used a more precise, descriptive, or graphic term—or a term that some may view as less callous and/or more sensitive.

[2] Defendant the City of Mt. Juliet is located in Wilson County, Tennessee. Defendant Kenny Martin is the City Manager of Mt. Juliet. James Hambrick is the Chief of Police of Mt. Juliet. Jennifer Hamblen is the Planning Director and Zoning Administrator of Mt. Juliet. Defendants Martin, Hambrick, and Hamblen are each sued in their official capacity.

[3] Prior to Carafem's opening, there was one abortion clinic in the Nashville area—a Planned Parenthood health center in Nashville. Planned Parenthood was unable to offer abortion services for several months in early 2019.

abortions[4] to women up to 10 weeks from their last menstrual period. While Carafem offered only medication abortions after the Mt. Juliet clinic opened, it announced in a February 28, 2019 press release that it planned to expand its services to include a second form of abortion, aspiration abortion, shortly thereafter.

In the first trimester of pregnancy, there are two alternative abortion methods: medication abortion and aspiration abortion. For a medication abortion, the patient ingests two pills and passes the pregnancy at home over the course of several hours or days. Not all patients are candidates for medication abortion. Medication abortion is available to women only up to 11 weeks from their last menstrual period. Medication abortion is also unsuitable for patients who have medical contraindications.

The alternative method, aspiration abortion—a type of surgical abortion—is the most common method of first-trimester abortion, involving the use of suction to empty the contents of the uterus. Aspiration abortion can be provided up to approximately 15 weeks following the last menstrual period.

Immediately after Carafem opened, numerous Mt. Juliet officials publicly expressed their opposition to Carafem's presence in Mt. Juliet, publishing the following statements:

- City Commissioner Brian Abston stated, "I was disgusted to hear they plan to open in my district and my town. . . . If there is anything we can legally do to keep them from opening in Mt. Juliet we will do it." Andy Humbles, *Mt. Juliet elected officials, religious leaders vow to fight new abortion clinic in city*, NASHVILLE TENNESSEAN (March 1, 2019, 5:03PM), https://www.tennessean.com/story /news/local/wilson/2019/03/01/mt-juliet-abortion-providercarafem-resistance-city-church/3029532002/.

- Commissioner Abston stated, "I realize they have rights, but my constituents and I don't want it here. I am prolife so I will take any action possible within the law to make sure it's not here." Laurie Everett, *MJ moves to stop abortion clinic*, THE WILSON POST, (March 6, 2019), https://www.wilsonpost.com/community/mj-

---

[4] Medication abortions are also referred to as "medical abortions." (Doc. No. 38-15 at 6).

3

moves-to-stop-abortion-clinic/article_3748b5ca3fd5-11e9-acee-bba608f35793
.html.

- Commissioner Ray Justice stated, "The City of Mt. Juliet did not approve an abortion clinic in our city! . . . We are pursuing every possible legal option to stop this 'organization' from being in Mt. Juliet. To a man, our city commission is Christian Conservative and will not just 'let this happen' without fighting." (Doc. No. 38-4 (Facebook, March 1, 2019)).

- Commissioner and Vice Mayor James Maness stated, "I am pro-life. The taking of innocent life is called murder. Abortion is not a matter of choice, it's a matter of life and how we value life." (Doc. No. 38-5 (Mt. Juliet Abortion Clinic, JamesManes.com, (March 1, 2019), https://www.jamesmaness.com/mt_juliet _abortion_clinic).

- Mayor Ed Hagerty stated, "I too am pro-life. . . . I am guessing most if not all on this email feel the same. Candidly, I am embarrassed and disgusted that this happened on my watch. If I had the power to stop it, I would have done so." Lefty, *Under cover of darkness*, LEFT-HANDED CONSERVATIVE (March 4, 2019), https://lefthandedconservative.wordpress.com/2019/03/04/under-cover-of-darkness/.

Two days after Carafem opened, the Mt. Juliet Board of Commissioners (the "Board") held a special meeting at which it introduced Ordinance 2019-16 (the "Ordinance"). The meeting lasted five minutes and involved only the first reading of the Ordinance. The Ordinance went before the Mt. Juliet Planning Commission on March 21, 2019, and the planning commission recommended approval. The City Commission approved the Ordinance on second reading on March 25, 2019 and on third reading on April 8, 2019.

The Ordinance modified the City's zoning restrictions by amending Part B of the Unified Development Code of the City of Mt. Juliet. Specifically, the Ordinance limited the location of Surgical Abortion Clinics—defined as "any entity, place or building in which surgical activity is primarily conducted or aimed toward terminating pregnancy, otherwise known as abortion as defined at Tenn. Code Ann. § 39-15-201"—to industrial zones I-G and I-S. (Doc. No. 38-8). The Ordinance also stated that no Surgical Abortion Clinic could "be located within 1,000 feet (measured property line to property line) of any church, public or private school ground, college

4

campus, public park or recreation facility, public library, childcare facilities, or a lot zoned residentially or devoted primarily to residential use [hereinafter, "specified locations"]." (*Id.*).

But the Ordinance's ostensible authorization for Surgical Abortion Clinics to locate at least *somewhere* within Mt. Juliet was entirely illusory. There is no land in Mt. Juliet zoned I-S, and the only two areas in Mt. Juliet currently zoned I-G are within either 1000 feet from a lot zoned for residential use or a church. Therefore, pursuant to the Ordinance, there was no land in Mt. Juliet where a Surgical Abortion Clinic could be located.

Carafem filed its original complaint in this action on December 18, 2019. (Doc. No. 1). Defendants contend that they did not realize that the Ordinance prevented Carafem from performing surgical abortions at any location in Mt. Juliet until after they reviewed the allegations in the Complaint. In any event, whether or not this was in fact a new revelation as Defendants claim, in January 2020 the Board introduced and passed Ordinance 2020-8 (the "Amendment"), amending the Ordinance. The Amendment revises the Ordinance in three relevant respects: (1) it reduces the distance restriction in the Ordinance; (2) it modifies how distances are measured, so that some parcels in the areas zoned I-G would now comply with the 1000 foot distance barrier between the clinic and the specified locations; and (3) it adds a rational for enacting the regulation regarding Surgical Abortion Clinics. (Doc. No. 38-10). The pertinent language was modified as follows (with the bolded and underlined language being added to the remaining original text, which is set forth in regular typeface):

> No establishment shall be located within ~~1000~~ **200** feet ~~(measured property line to property line)~~ of any church, public or private school, college ~~campus~~, public park or public recreation facility, public library, child care facility**, or a single family residential home. Distance will be measured along the shortest drivable route from the center of the main entrance (i.e. front door) of one location to the center of the main entrance (i.e. front door) of the other location. After permitting of the establishment, any protected use that comes within the**

**protected area of the establishment will not affect the establishment's ability to continue operations.**

(*Id.*). Additionally, the Amendment added that the purpose of the new zoning regulations is to "promot[e] the health, safety and welfare of not only those seeking to utilize the services of a surgical abortion clinic but also to preserve the City's economic growth and shift protests to a less densely populated area." (Doc. No. 38-10).

Currently, Carafem is located in a commercial interchange ("C-I") zoning district. Under Mt. Juliet's zoning code, C-I districts permit "Professional Services, Medical,"—which includes various types of physicians' offices and clinics, dental offices, optometrists, and outpatient medical service facilities. Section 2-103.3 of the Zoning Regulations define "Professional Services-Medical" as follows:

> Professional services—Medical. This activity classification is intended to include establishments primarily engaged in providing therapeutic, preventative or correctional personal treatment services on an out-patient basis by physicians, dentists, and other medical practitioners, as well as the provision of testing and analysis services. This grouping is limited and does not include the broad ranging services provided at general health care facilities such as hospitals but does include limited outpatient services provided at offices of doctors, dentists outpatient clinics, and other health care providers, whether operated for profit or otherwise.

(Doc. No. 46-1 at 15). The parties disagree about the extent to which this definition, correctly construed, excludes[5] the provision of abortion services. Defendants say that it does, but then (as noted in a lengthy footnote below) curiously also say that this exclusion historically had been "overlooked" so that the City permitted medication abortions to be provided at Carafem's current facility. (Doc. No. 43 at 11-12). Plaintiff asserts that this definition excludes neither medication abortions nor surgical abortions. (Doc. No. 50 at 1-3). Seemingly admitting that Plaintiff *could* be

---

[5] Here, the Court uses the term "exclude" to encompass both "not include" and "affirmatively exclude." The Court so notes because the notion of "exclusion" could be taken by the reader to refer only to what is *excluded* in the second sentence of the definition, and not to what is *not included* within the first sentence; the Court does not mean "exclude" in this limited sense.

6

correct about this, the City asserts "[a]nother interpretation of the City's actions": "that it squeezed medical abortions into the concept of 'therapeutic [services],'" which do fit within the definition of "Professional Services—Medical," which are permitted at Carafem' current location. (Doc. No. 43 at 12).

By contrast, the parties agree that the Ordinance and Amendment prohibit Carafem from performing surgical abortions in its current facility. However, Carafem continues to provide medication abortions. Carafem has turned away women seeking surgical abortions who are not eligible for medication abortions, including all women past 11 weeks of pregnancy and those with contraindications to medication abortions.

As Mt. Juliet's zoning map stands, there are two I-G zoned areas in Mt. Juliet where Carafem would be permitted to perform surgical abortions. There are currently no medical office facilities in either I-G-zoned area, and one of them is a vacant plot of land in an isolated region.

Significantly, there is nothing in the Ordinance, the Amendment, or the definition of "Professional Services-Medical" that acknowledges any distinction between pre-viability abortions and post-viability abortions.

## LEGAL STANDARD

The Sixth Circuit has held that the district court must balance four factors when considering a motion for preliminary injunction under Federal Rule of Civil Procedure 65: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether the issuance of the injunction would cause substantial harm to the opposing party or others; and (4) whether the public interest would be served by the issuance of the injunction. *Bays v. City of Fairborn*, 668 F.3d 814, 818–19 (6th Cir. 2012). The second of these factors, irreparable injury absent the injunction, must be present in

order for the Court to issue the requested preliminary injunction. *See, e.g.*, *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 105 (6th Cir. 1982) ("Whatever the merits of the alternate, or 'balance of hardships' test may be, the purpose of the test is surely not to eliminate the irreparable harm requirement."). Otherwise, though, these four items are not prerequisites that must be satisfied in order for a preliminary injunction to be issued, but rather factors to be balanced against one another based on their respective strength relative to one another. *See D.T. v. Sumner Cty. Schools,* 942 F.3d 324, 326-27 (6th Cir. 2019) (citations omitted).[6]

"A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban County Government*, 305 F.3d 566, 573 (6th Cir. 2003). And the party seeking a preliminary injunction bears a burden of justifying such relief. *Kentucky v. U.S. ex rel.*

---

[6] The Court is aware that confusion was created when language in some cases appeared to state that a "balance of hardships" test was an alternative to the traditional irreparable harm test for injunctive relief. *See Friendship Materials, Inc.,* 679 F.2d at 105. The balance of hardships test, however, does not eliminate the irreparable harm requirement. *Id.* As the Sixth Circuit noted last year:

> Courts sometimes describe this inquiry as a balancing test. *See, e.g.*, *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007); *In re Eagle-Picher Indus., Inc.*, 963 F.2d 855, 859 (6th Cir. 1992). And that's true, to an extent; district courts weigh the strength of the four factors against one another. But even the strongest showing on the other three factors cannot "eliminate the irreparable harm requirement." That factor is indispensable: If the plaintiff isn't facing imminent and irreparable injury, there's no need to grant relief *now* as opposed to at the end of the lawsuit. That's why this circuit has held that a district court abuses its discretion "when it grants a preliminary injunction without making specific findings of irreparable injury[.]" Thus, although the *extent* of an injury may be balanced against other factors, the *existence* of an irreparable injury is mandatory.

*Sumner Cty. Schools,* 942 F.3d at 326-27 (citations omitted).

*Hagel*, 759 F.3d 588, 600 (6th Cir. 2014) (quoting *Michigan Catholic Conf. & Catholic Family Servs. v. Burwell*, 755 F.3d 372, 382 (6th Cir. 2014)).

## ANALYSIS

In the Amended Complaint, Plaintiff alleges that the Ordinance and Amendment: (1) were enacted for the purpose of imposing, and have the effect of imposing, an undue burden on women seeking a surgical abortion in Mt. Juliet, in violation of the Due Process Clause of the Fourteenth Amendment; (2) deny equal protection of the laws to Plaintiff and its patients in violation of the Equal Protection Clause of the Fourteenth Amendment; and (3) are arbitrary, unreasonable, capricious, and discriminatory zoning regulations that lack any substantial relationship to the public health, safety, morals, or general welfare, in violation of the Due Process Clause of the Fourteenth Amendment and Article I, Section 8 of the Tennessee Constitution. (Doc. No. 36 ¶¶ 106-115).[7]

---

[7] In their Response, Defendants argue that the Court should address issues of statutory interpretation and not reach the constitutional issues asserted in Plaintiff's Motion. According to Defendants, because Mt. Juliet's zoning restrictions were silent as to abortion clinics prior to the City's enactment of the Ordinance and Amendment ("pre-Ordinance period"), Mt. Juliet's zoning laws could be interpreted such that surgical or medication abortions were not permitted anywhere within Mt. Juliet's city limits during the pre-Ordinance period. (Doc. No. 43 at 10-15). Therefore, they argue that by authorizing abortion clinics to operate in I-G or I-S zoning areas (if they satisfy certain distance restrictions), the Ordinance and Amendment do not impair the rights of Carafem or women seeking to obtain an abortion but actually make access to abortion potentially easier. Defendants concede that this argument is based on interpreting Mt. Juliet's pre-Ordinance zoning regulations to be in tension with (if not in outright contravention of) Tennessee common law's prohibition against exclusionary zoning and with the dictate of *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992) that "the City not take action or inaction that had the purpose or effect of imposing a substantial burden on the relevant woman's right to abortion." (*Id.* at 12). But Defendants contend that the City reconciled this tension, and thus stayed in compliance with stated federal law, by "overlooking" the prohibition against abortions entailed by the definition of "Professional Services-Medical" to the extent necessary by permitting medication abortions. (*Id.*). This argument is at worst inscrutable and at best groundless.

First, Defendants provide no support for their illogical interpretation. Certainly the City's actions to date do not support this interpretation. Rather, as Plaintiff points out, when Carafem first opened its doors, the City did not suggest that its zoning laws prohibited abortions from being

At this juncture, the Court is not deciding the ultimate merits of Carafem's case against Defendants. Rather, the present issue for the Court to determine is whether Carafem has presented evidence sufficient to show that a preliminary injunction is warranted at this time.[8] As discussed

---

conducted on the premises. Nor do the contemporaneous statements of the City officials (quoted above) support the notion that the City interpreted its zoning regulations as it now suggests. (Doc. No. 1 ¶ 40 (Mayor Hagerty stated, "If I had the power to stop it, I would have done so.").

Second, the Court is amazed by Defendants' suggestion that the City's zoning restrictions should be interpreted in such a way that they collide head on with Tennessee's prohibition against exclusionary zoning and with *Casey*. Indeed, Defendants themselves suggest in two places that this interpretation may be wrong. (Doc. No. 43 at 14 ("The City and its counsel who represent it in this case recognize that they may be wrong about their interpretation of the Zoning Regulations including the definition of 'Professional services-Medical' and the non-conforming use laws."); *id.* at 12 ("[a]nother interpretation of the City's actions": "that it squeezed medical abortions into the concept of "therapeutic [services], which do fit within the definition of "Professional services—Medical," which are permitted at Carafem' current location.). The Court is not persuaded.

Defendants spend a full page explaining to the Court that abortion precedent may change and, therefore, the Court should try to avoid such constitutional issues and attempt to resolve the matter through statutory interpretation. This too is unpersuasive. The Court recognizes that under Supreme Court precedent, "courts should avoid unnecessary adjudication of constitutional issues," and "[w]here a statutory or nonconstitutional basis exists for reaching a decision ... it is not necessary to reach the constitutional issue." *Adams v. City of Battle Creek*, 250 F.3d 980, 986 (6th Cir. 2001). Indeed, "[a] fundamental and longstanding principal of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them." *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445-46 (1988) (citations omitted). But the Court is not supposed to contort the facts of the case in order to avoid a constitutional issue where one clearly exists. Moreover, until the Supreme Court specifically overturns controlling precedent, this Court is bound to apply the standards of *Roe v. Wade* and its progeny, regardless of the undersigned's views of the merits and/or the future prospects of such precedent. Accordingly, the Court will not stretch the issue of statutory interpretation as far as Defendants request simply to avoid a constitutional question that is clearly at the heart of this matter.

[8] It bears mentioning what are *not* the issues for the Court on this Motion (or at any point in this litigation). The issue is not what the undersigned personally thinks about the nature and origin of a human life, abortion, abortion rights, laws restricting abortions, *Roe v. Wade* and its progeny, those (including litigants and citizens generally) who believe that what they are doing is seeking to vindicate important constitutional rights, or those who believe that what they are doing is seeking to protect human lives. The undersigned does not write on a clean slate. Instead, he must, and will, set aside all personal beliefs and decide the case by applying applicable precedent, as he construes it, to the facts, as he finds them.

10

below, the Courts answers that question in the affirmative; Carafem has adequately demonstrated that the extraordinary remedy of a preliminary injunction is warranted in this case.

1. Likelihood of Success on the Merits

In its Motion, Plaintiff has asserted two arguments attacking the constitutionality of the Ordinance and Amendment.[9] First, Plaintiff asserts that the purpose and effect of the Ordinance and Amendment are to impose an undue burden on a women's right to an abortion, in violation of the Due Process Clause. Second, Plaintiff asserts that, with no legitimate basis for doing so, the Ordinance and Amendment improperly distinguish between surgical abortions and numerous allegedly comparable medical procedures, in violation of the Equal Protection Clause. The Court will consider each of these constitutional challenges in turn.

A. Due Process Clause of the Fourteenth Amendment

The Due Process Clause of the Fourteenth Amendment provides women with a substantive right to choose to terminate a pregnancy, subject to certain limitations. *See Roe v. Wade*, 410 U.S. 113 (1973). In *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 878 (1992),[10] a plurality of the Supreme Court established that the constitutionality of abortion regulations, as they

_____

[9] The Motion does not explicitly address Count IV of the Amended Complaint, which alleges: "The Original Ordinance and Amendment are arbitrary, unreasonable, capricious, and discriminatory zoning regulations that lack any substantial relationship to the public health, safety, morals, or general welfare. The Ordinance and Amendment violate both the Due Process Clause of the Fourteenth Amendment and Article I, Section 8 of the Tennessee Constitution, and is invalid." (Doc. No. 36 ¶ 115). Nevertheless, Plaintiff's likelihood of success on Counts I-III alone supports the issuance of the requested preliminary injunction.

[10] Although a plurality (as opposed to majority) opinion is not generally precedential, the Sixth Circuit has adopted the "undue-burden" standard enunciated by the plurality in *Casey*, 505 U.S. at 845–846, as controlling precedent in abortion cases. *See Women's Medical Professional Corp. v. Baird*, 438 F. 3d 595, 603 (6th Cir. 2006); *see also Stenberg v. Carhart*, 530 U.S. 914, 930 (2000) (applying, in a majority opinion, the undue burden standard from the Casey plurality opinion).

11

relate to pre-viability abortions, is determined by examining whether the regulation imposes an "undue burden" on a woman's right to decide to have an abortion. *Id.* at 878.[11] In *Casey*, the Court "concluded that there 'exists' an 'undue burden' . . . , and consequently a provision of law is constitutionally invalid, if the *'purpose or effect'* of the provision *'is to place a substantial obstacle* in the path of a woman seeking an abortion before the fetus attains viability.'" *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2299 (2016) (discussing *Casey*). Thus, a party challenging such a burden can base its challenge on the purpose of the burden or the effect of the burden (or both); these two alternative grounds for a challenge are sometimes called the "purpose prong" and the "effects prong."

Of course, this begs the question of what kind of obstacle is "substantial" for purposes of the undue-burden test. Not all regulations that make it more difficult for a woman to obtain an abortion are deemed to impose an undue burden. As stated by the *Casey* plurality:

> Numerous forms of state regulation might have the incidental effect of increasing the cost or decreasing the availability of medical care, whether for abortion or any other medical procedure. The fact that a law which serves a valid purpose, one not designed to strike at the right itself, has the incidental effect of making it more difficult or more expensive to procure an abortion cannot be enough to invalidate it. Only where the state regulation imposes an undue burden on a woman's ability to make this decision does the power of the State reach into the heart of the liberty protected by the Due Process Clause.

---

[11] This formulation not only begs the question of *what* burdens are undue, it also highlights the issue of who *gets to decide* what burdens are undue. After all, legislators who by majority vote have imposed a restriction on abortion presumably did not think that the burden was "undue"; on the contrary, presumably they imposed such burden precisely because they thought it was indeed "due." But in our constitutional system, including case law such as *Marbury v. Madison*, 5 U.S. 137 (1803), and its progeny, a federal court with jurisdiction over a case challenging the constitutionality of the burden gets to decide, trumping the legislative body's original implicit determination on that issue. For this particular federal court, with the undersigned presiding, this decision is made based not on what the undersigned thinks is undue, but rather on what applicable binding precedent tells him to declare undue.

12

*Casey*, 505 U.S. at 874. Accordingly, "a state may impose restrictions on the woman's access to an abortion that are designed to help her make the most informed decision or that serve some other valid state interest; however, a state may not erect procedural hurdles in the path of a woman seeking an abortion simply to make it more difficult for her to obtain an abortion." *Memphis Planned Parenthood, Inc. v. Sundquist*, 175 F.3d 456, 461 (6th Cir. 1999). And "a State may not prohibit any woman from making the ultimate decision to terminate her pregnancy *before viability*." *Casey*, 505 U.S. at 879 (emphasis added). As indicated, the undue burden standard applies only to restrictions on pre-viability abortions, such as the one(s) implicated in this case; restrictions on post-viability abortions are subject to a different analysis. *Women's Med. Prof'l Corp. v. Voinovich*, 130 F.3d 187, 208 (6th Cir. 1997) ("the State may prohibit post-viability abortions—*i.e.,* the undue burden standard is inapplicable—[although] it must continue to permit abortions [under certain circumstances]." (citing *Casey*, 505 U.S. at 879)).[12] Notably, *Casey* declined to specify a precise time of "viability", although it suggested that it may (at least as of 1992) occur at around 23 or 24 weeks of gestational age. *See id.* at 860; *id.* at 933 (Blackmun, J., concurring).

### i. The Purpose of the Ordinance and Amendment

First, Plaintiff argues that it is likely to succeed on its claim that the Ordinance and Amendment are unconstitutional under the Due Process Clause of the Fourteenth Amendment

---

[12] As noted above, the zoning provisions here at issue do not distinguish in any way between pre-viability abortions and post-viability abortions. Thus, when the Court below discusses the undue burden standard in connection with these provisions, it is with the understanding that the standard applies because these provisions apply to pre-viability abortions (which are subject to the undue burden standard), and not just to post viability abortions (which are not). With this understanding, the Court need not and will not repetitive qualify "abortion(s)" with "pre-viability" in such discussions.

13

because the *purpose* of the Ordinance and Amendment is to target abortion. In *Hellerstedt*, the Supreme Court reaffirmed *Casey*'s command that states may not enact regulations with the real purpose of placing a substantial obstacle in the path of a woman seeking a pre-viability abortion. 136 S. Ct. at 2311.[13] The Court reiterated the established principle that "[where constitutional rights are at stake,] the 'Court retains an independent constitutional duty to review factual findings.'" *Id.* (quoting *Gonzales v. Carhart*, 550 U.S. 124 (2007)). Overall, *Hellerstedt* makes clear that in the context of a constitutional challenge to an abortion law, courts are to "place[] considerable weight upon evidence and argument presented in judicial proceedings," *id.* at 2310, and "not only [] scrutinize the reasons given for a state action, but also the evidence provided by the state supporting its action." *Whole Woman's Health All. v. Hill*, 937 F.3d 864, 877 (7th Cir.

---

[13] In *Hellerstedt*, the Supreme Court found unconstitutional a Texas law requiring physicians who perform abortions to have admitting privileges at a local hospital and requiring abortion clinics to maintain the health and safety standards required for ambulatory surgical centers. *Id.* at 2300. Although *Hellerstedt*'s analysis ultimately focuses on whether the law had the effect (as opposed to the purpose) of imposing an undue burden on a woman's right to obtain an abortion, the Court "explained the importance of the judiciary's role when invidious state purposes are alleged." *Hill*, 937 F.3d at 877 (discussing *Hellerstedt*). The Court also provided that when applying *Casey's* undue burden balancing test, courts should consider the evidence in the record and should not blindly accept the state's articulated reason(s) for acting. *Hellerstedt*, 136 S. Ct. at 2309-10. Prior to *Hellerstedt*, the Seventh Circuit interpreted *Casey* and *Mazurek v. Armstrong*, 520 U.S. 968 (1997), to suggest that a purpose-prong "challenge will rarely be successful, absent some sort of explicit indication from the state that it was acting in furtherance of an improper purpose." *Karlin v. Foust*, 188 F.3d 446, 493 (7th Cir. 1999); *id.* at 496 ("Absent some evidence demonstrating that the stated purpose is pretextual, our inquiry into the legislative purpose is necessarily deferential and limited."). In *Hill*, however, the Seventh Circuit held that the state's excessive requests and demands throughout the abortion clinic's license application process had "gone beyond constitutional boundaries." 937 F.3d at 877-78. In so finding, the Seventh Circuit took instruction from *Hellerstedt* and "scrutinize[d] the facts rigorously, in order to determine what the [state] was doing with the [plaintiff's] license application over the past two years." *Id.* at 877 ("When the state burdens a constitutional right, it must have a constitutionally permissible reason. If the evidence does not support the state's proffered reason, or it reveals instead an impermissible reason, the state law cannot stand."). Accordingly, when invidious state purposes are alleged and supported by relevant evidence, the court has a duty to scrutinize whether the evidence supports the state's proffered reason for imposing the law.

14

2019). Accordingly, where a plaintiff has argued and presented evidence demonstrating that a regulation's stated purpose is pretextual, the court must conduct a full analysis of the record and not automatically defer to the stated legislative purpose. *Id.* ("[T]he Constitution does not tolerate pretext that covers up unconstitutional motives. It is plain, that . . . an official action, . . . taken for the purpose of violating constitutional rights has no legitimacy at all under our Constitution." (citing *City of Richmond, Virginia v. United States*, 422 U.S. 358, 378 (1975))).[14] Relevant to the Court's purpose-prong analysis are "the language of the challenged act, its legislative history, the social and historical context of the legislation, or other legislation concerning the same subject matter as the challenged measure." *Okpalobi v. Foster*, 190 F.3d 337, 354 (5th Cir. 1999) (terminating tort liability for abortion providers after finding improper purpose in the plain language of the statute); *rev'd on other grounds*, 244 F.3d 405 (5th Cir. 2001) (en banc).

Here, Plaintiff argues that the purpose of the Ordinance and Amendment was to unduly burden Tennessee women seeking surgical abortions. (Doc. No. 38 at 11). Defendants disagree, insisting that the Amendment has articulated constitutionally valid purposes—namely, that the law "incentivize[s] providers to locate clinics where the provider can provide both [medical and surgical abortions], potentially own and control an entire parcel and, thus, control access to better protect its patients from protesters." (Doc. No. 43 at 17). Defendants also contend that in passing the regulation, the City hoped to "minimize disruption in its vital commercial center." (*Id.*). Plaintiff argues that the legislative history and the contemporaneous statements of city officials

---

[14] Here, the Court is deciding the Motion on the papers, therefore it will consider the evidence and arguments included in the parties' submissions in lieu of evidence and argument presented in judicial proceedings. *See Planned Parenthood of Indiana & Kentucky, Inc. v. Comm'r of Indiana State Dep't of Health*, 896 F.3d 809, 822 (7th Cir. 2018) (noting that the "court could base a preliminary injunction on less formal procedures and less extensive evidence than a trial on the merits").

make clear that these purported purposes are pretextual. (Doc. No. 38 at 11-12). Plaintiff also argues that the Ordinance and Amendment's operation in practice confirms its purpose.

The Court finds that Plaintiff has set forth substantial evidence demonstrating that the purposes stated in the Amendment are pretextual; therefore, the Court does not automatically defer to the stated legislative purpose. And, based upon its review of the record, the Court finds that Plaintiff is likely to succeed on the merits of its due process claim because the purpose of the Ordinance and Amendment is to target abortion.

As Plaintiff notes, the legislative history of the Ordinance and Amendment cast doubt upon the legislative purpose stated in the Amendment. The Ordinance is silent as to its purpose, and the Court recognizes that this silence is not indicative of an improper purpose. *See Mazurek*, 520 U.S. at 972 ("We do not assume unconstitutional legislative intent even when statutes produce harmful results . . . ."). However, after Plaintiff filed its Complaint, the City passed the Amendment, which adds that its purpose is to "promot[e] the health, safety and welfare of those seeking to utilize the services of a surgical abortion clinic but also to preserve the City's economic growth and shift protests to a less densely populated area." (Doc. No. 38-10). This subsequent attempt to legitimize the regulation's purpose in response to the Complaint does not move the needle. Although the Court does not assume unconstitutional legislative intent merely because the City added a legislative purpose after the Complaint was filed, when this fact combined with the additional evidence Plaintiff has submitted, the Court has reason to doubt the authenticity of the City's stated purpose.

Plaintiff argues that the contemporaneous statements of the officials who drafted and passed the Ordinance and Amendment demonstrate an improper purpose. The Court agrees. The statements made by four out of the five members of the Board of Commissioners, the same group

16

who introduced and passed the Ordinance and Amendment,[15] strongly support Plaintiff's argument that the purpose of the zoning regulation is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability. Each of the statements, made within a week of Carafem opening its doors, demonstrates an intent to expel Carafem from Mt. Juliet. Their statements were clear. Four of the five officials essentially said "I (or we) will (or intend to, or would) take action to stop Carafem from operating in Mt. Juliet." The fifth, Commissioner and Vice Mayor Maness, did not frame things in quite these terms, but he did unmistakably imply that abortion is murder—and it is a short leap indeed to conclude that this public official, who naturally would be bent on preventing murder in his community, was intent on stopping Carafem from operating in Mt. Juliet.

So when these five enact a law with the *effect* of preventing Carafem from operating in Mt. Juliet, there is every reason to believe that each was acting with the *purpose* of preventing Carafem from operating in Mt. Juliet. Defendants contend that these statements do not indicate an unconstitutional purpose because the officials also recognized that any actions taken would need to be within the law. (Doc. No. 43 at 18-19); To be sure, three of the five specifically indicated that they would resort only to lawful means to stop carafem's provision of abortions. *See, e.g.*, Everett, *supra* page 3 ("I will take any action possible within the law to make sure it's not here.").

---

[15] The Agenda of the April 8, 2019 Special Meeting of the Mt. Juliet Board of Commissioners is published on the Mt. Juliet City website. The Agenda shows that the Board of Commissioners unanimously approved the Ordinance on April 8, 2019, specifically stating that the ayes included Ed Hagerty, James Maness, Art Giles, Ray Justice, and Brian Abston. Agenda April 08, 2019 Mt. Juliet Board of Commissioners, City of Mt. Juliet, http://mtjulietcitytn.iqm2.com/Citizens/SplitView.aspx?Mode=Video&MeetingID=1834 (last visited May 1, 2020). The Court takes judicial notice of the information contained in the Agenda of the April 8, 2019 Special Meeting of the Mt. Juliet Board of Commissioners because the accuracy of this source of the information (the Agenda posted online) cannot be reasonably questioned.

17

However, the officials' recognition that they could not implement unlawful regulations is irrelevant. There was not then (and is not now) any legal way to implement a regulation for the purpose of restricting access to all abortions, pre-viability or post-viability alike.[16] Despite their expressed intention to implement such restriction only by lawful means, there was in fact no way to implement such restriction lawfully, precisely because their purpose was to implement such restriction. The way the purpose prong inherently works, if the end (purpose) of particular legislation is to impose an undue burden, then the means for achieving that end (the legislation) is necessarily unconstitutional; thus, no ordinance can serve as a lawful means of achieving the unlawful purpose of an undue burden.

Notably, the officials' statements make no reference to the purposes set forth in the Amendment. Their statements do not reflect a desire to implement a zoning law to protect the City from economic instability as a result of the purported externalities of Carafem's presence. Nor do they indicate an intent to promote the health and safety of the women seeking abortions. The officials played their hand—they made clear their position: that they were going to do whatever they could to prevent abortions within Mt. Juliet because, according to them (and, presumably, many of their constituents), abortion is morally wrong.

These statements are unlike those analyzed in *Women's Medical Professional Corp. v. Baird*, 438 F. 3d 595, 608 (6th Cir. 2006). In *Baird*, the Sixth Circuit held that a facially-neutral licensing statute did not impose an undue burden on women seeking abortions.[17] In *Baird*, the

---

[16] The situation might be different if these efforts had been directed only at post-viability abortions. But in this case, they were not; efforts were aimed at abortion generally, without any distinction between abortion of pre-viability fetuses and abortion of post-viability fetuses.

[17] *Baird* is also inapposite because the statute at issue here is not facially neutral. The Ordinance and Amendment specifically target Surgical Abortion Clinics.

18

plaintiff submitted evidence demonstrating that constituents and other political leaders had sent to the defendant hundreds of letters urging him to close the abortion clinic, not to grant the clinic a waiver under the licensing statute, and to "enforce the law" against the clinic. *Id.* at 600. The defendant responded to one senator's letter, stating "we have confirmed that the transfer agreement was rescinded by the hospital effective December 20th . . . and are conferring with legal counsel to determine the options available to us subsequent to December 20th." *Id.* The Sixth Circuit did not find that these statements were evidence of an improper purpose because although "the district court found that [the defendant] was affected by political pressure, it never made a finding that [the defendant] acted with an unconstitutional purpose." *Id.* at 609. By contrast, as discussed above, the statements made by members of the Board clearly indicated that the officials responsible for passing the law themselves had the purpose—fostered by their impassioned personal (not to say unusual) beliefs regarding abortion—of preventing women from obtaining abortions in Mt. Juliet.[18]

In their Response, Defendants stand behind the legitimacy of the purposes stated in the Amendment, arguing that the zoning regulation was enacted to incentivize providers to locate clinics where it can provide both medical and surgical abortions, potentially own and control an entire parcel and, thus, control access to better protect its patients from protesters. (Doc. No. 43 at

---

[18] Nor is this case analogous to *Mazurek*, in which the Supreme Court considered whether a Montana law requiring abortions be performed by licensed physicians imposed an undue burden on a woman's right to obtain an abortion. *Mazurek*, 520 U.S. at 973. In concluding that neither the purpose nor the effect of the law created an undue burden, the Supreme Court held that the fact that an anti-abortion group had drafted the law "sa[id] nothing significant about the legislature's purpose in passing it." *Mazurek*, 520 U.S. at 973. Although the anti-abortion *activists'* intent was clear, the plaintiff in *Mazurek* did not provide information evidencing the *legislators'* intent. By contrast, the members of the Board here were ultimately responsible for passing the Ordinance and Amendment and it was their statements that indicated their personal intent to keep Carafem out of Mt. Juliet.

19

17). Defendants also argue the protesters have disrupted the businesses surrounding Carafem as demonstrated by the vacancy rates at the nearby office buildings. (*Id.* at 17-18). But, as discussed below, Defendants have provided no evidence suggesting that the Board considered any testimony, documents, or other information relating to its supposed purposes, or considered any other means by which it could further its purported goals, prior to passing the Ordinance or Amendment. While Defendants state that "they have documented that protestors have disrupted operations at the adjoining hotel" and that "vacancy rates at the office buildings are concerning" (Doc. No. 43 at 17-18), these statements are unsupported and say nothing about any actions the Board did or did not take in investing the merits of enacting, or alternatives to, the Ordinance and Amendment to achieve these now-purported purposes. As far as the record shows, the Board did not display any interest in truly exploring how best to meet the now-purported objectives, thus suggesting that it really was not interested in these objectives.

Further, Defendants have not provided any evidence indicating that the Ordinance and Amendment would in fact further any of the regulation's stated purposes. Nor do they provide any basis to support the notion that in implementing the law the Board had any basis to believe the stated purposes would be furthered.

The Court must and does call a spade a spade here. On this record, it is unwilling to believe for a moment that what these five committed opponents of abortion (whose sincerity the Court does not question and whose "correctness" on the issue the Court does not presume to judge) really wanted to accomplish here was to *promote a more permanent presence for abortion providers* by encouraging them to "potentially own and control an entire parcel."

Therefore, Defendants mere restatement in their Response of the purposes stated in the Amendment fails to overcome the evidence submitted by Plaintiff demonstrating that, in all

likelihood, Defendants' claimed purposes in enacting the law were a pretext and that Defendants' purpose was to impose a substantial (if not complete) obstacle to women's access to abortions in Mt. Juliet.

And *Casey* and *Hellerstedt* say that if such a purpose motivates a law that imposes an obstacle to women obtaining a pre-viability abortion, the obstacle is unconstitutional. *See Hellerstedt*, 136 S. Ct. at 2299 ("[A] provision of law is constitutionally invalid, if the *'purpose or effect'* of the provision *'is to place a substantial obstacle* in the path of a woman seeking an abortion before the fetus attains viability.'" (quoting *Casey,* 505 U.S. at 878)). And one might say that, like the obstacle, the purpose behind it is, in effect, unconstitutional.

The Court does not, and need not, denigrate the likely purpose behind the Ordinance and Amendment other than to say that under the current law of this land, such purpose is off limits. In this country, legislative bodies are free to pursue all kinds of purposes; indeed, that is why we have legislative bodies—to identify valid purposes and attempt to carry them out via legislation. But the Supreme Court has made clear that some purposes may not constitutionally be pursued, and the likely purpose here at issue is one of them. The undersigned does not expect opponents of abortion to like the Supreme Court's view about such a purpose. But the undersigned *does* expect elected opponents of abortion to avoid a disingenuous end run around the Supreme Court's view by cloaking what (according to the Supreme Court) is an impermissible purpose in the garb of a different, purportedly permissible purpose. Here, it appears likely at this stage that this is precisely what has occurred: elected opponents of abortion, unable to pursue their objective of stopping abortions in their community via ordinance in the manner they are accustomed to pursuing other objectives, have conjured up non-existent objectives after the fact. Again, the Court here need not and does not impugn the likely actual objective here. If anything, the Court's comments suggest

21

that if (as many citizens believe) this objective is an important one, its proponents perhaps should not seemingly disavow or derogate it via disingenuous protestations that they never even had this objective and that their actual objective was (for example) to establish a more permanent presence for abortion providers in the community.

Take the Vice Mayor, for example. He is, of course, allowed to be concerned about what he views as murder. But that's just the point: in all likelihood, *this* (rather than the promotion of the health and welfare of those accessing abortion clinic, or the preservation of Mt. Juliet's economic growth, or the desirability of shifting protests to a less densely populated area, and, especially, the promotion of a more permanent presence for abortion providers) was his concern. And although he is allowed to *have* those concerns—this being America, where we allow freedom of conscience—the Supreme Court says that such concerns may not be *addressed* with legislation having the purpose of prohibiting pre-viability abortions. That is the legal landscape facing opponents of abortion, and it cannot successfully be traversed by the simple expedient of feigning some other purpose. This Court by no means expects any particular person to like that landscape. But it does expect municipalities to deal with it in candid manner, including by being forthright about the purposes of its actions with respect to restrictions on abortions.

As noted, Supreme Court precedent provides that a law regulating abortion is unconstitutional if *either* "its purpose *or* effect is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability" *Casey*, 505 U.S. at 878 (emphasis added), and the Court here has found that the purpose of the Ordinance and Amendment likely was to impose an undue burden. That seemingly would settle the current issue. However, the Supreme Court has questioned, albeit in dicta, whether "a legislative *purpose* to interfere with the constitutionally protected right to abortion without the *effect* of interfering with that right . . . could

render [a law] invalid." *Mazurek*, 520 U.S. at 972. Assuming that the answer to this question conceivably could be "no," that raises the possibility that even when (as here) a court has found that a regulation was implemented with an improper purpose, the court still needs to determine whether the regulation "had the effect of interfering with" what *Mazurek* called "the constitutionally protected right to abortion."

But assuming (as the Court does here) that the court is indeed called upon to determine the effects of the regulation whose purpose was to interfere with the constitutional right to abortion, that raises the question of what precise determination the Court is supposed to make. Specifically, under these circumstances if the Court must determine whether the effect was to "interfere" with the right to an abortion, does the Court ask: (a) consistent with the undue burden test, whether the regulation place a "substantial obstacle" in the path of a woman seeking an abortion; or (b) whether the regulation caused *any* appreciable interference, by making it more difficult or more expensive to procure an abortion to *any* degree? Perhaps the plaintiff's satisfaction of the lower standard for "effects" would be deemed sufficient in cases where the purpose has been found constitutionally infirm. But as noted below, the Court need not decide, because it will assume that the higher standard applies and use the undue burden test.

That leads to the next question. In making the "effects" determination where the purpose is constitutionally infirm, does the Court consider incidental, legitimate state benefits flowing from the regulation, which is part of the balancing test at the heart of the undue burden standard? It is clear to the Court that if the law operates as an absolute ban on "the right to abort a nonviable fetus for a defined class of women," the undue burden standard is not appropriate, and instead the law is deemed unconstitutional irrespective of any alleged countervailing regulatory benefits of the type necessarily considered under the undue-burden standard. *Little Rock Family Planning*

*Services v. Rutledge*, 398 F. Supp. 3d 330, 379 (E.D. Ark. 2019); *Isaacson v. Horne*, 716 F.3d at 1225 (finding undue burden analysis inapplicable where the state is "forbidding certain women from choosing pre-viability abortions"). And, as the Supreme Court has stated, "[It] is plain, [that] ... [a]n official action, ... taken for the purpose of [violating constitutional rights] has no legitimacy at all under our Constitution." *City of Richmond, Virginia v. United States*, 422 U.S. 358, 378 (1975) (remanding for further proceedings with respect to unconstitutional discriminatory purpose); *id.* at 37 ("Acts generally lawful may become unlawful when done to accomplish an unlawful end." (quoting *W. Union Tel. Co. v. Foster*, 247 U.S. 105, 114 (1918)). Nevertheless, under *Casey*, state actions are prohibited when they "serve *no purpose other than* to make abortions more difficult." *Casey*, 505 U.S. at 901 (emphasis added). This all indicates to the Court uncertainty as to whether, in making its alternative "effects" determination, it should take account of the purported beneficial effects flowing from the municipal regulations

But the Court need not decide this issue. Instead, the Court assumes *arguendo* that the regulations' purported benefits are to be considered; thus, the Court has applied the undue burden test to the Ordinance and Amendment, thus weighing the purported benefits of the law against the burdens on a women's right to an abortion. And having undertaken that balancing test, the Court has determined that the effect of the Ordinance and Amendment unduly burdens women seeking an abortion, the Court need not resolve this issue today.

ii.   The Effect of the Ordinance and Amendment

Plaintiff argues that even if the Ordinance and Amendment are not unconstitutional under the purpose prong alone, the regulation is nevertheless unconstitutional because its effect is to unduly burden women's right to an abortion. In order to determine whether a regulation has the effect of imposing an undue burden, courts weigh the asserted state benefits against the burdens

24

imposed on a woman's access to a pre-viability abortion, considering both the evidence and arguments before it. *Hellerstedt*, 136 S. Ct. at 2310. Where, as here, the constitutionality of an abortion statute is challenged on its face, the court applies *Casey's* "large fraction" standard, which looks to whether the statute at issue would impose an undue burden "in a large fraction of the cases in which [it] is relevant[.]" *Casey*, 505 U.S. at 895; *Cincinnati Women's Servs. v. Taft*, 468 F.3d 361, 367 (6th Cir. 2006) (holding that a plaintiff must show that "in a large fraction of the cases in which [the abortion restriction] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion").

As discussed above, Defendants argue that the Ordinance and Amendment confer two "constitutionally acceptable" benefits. Specifically, the Amendment states that its purpose is "to promot[e] the health, safety and welfare of not only those seeking to utilize the services of a surgical abortion clinic but also to preserve the City's economic growth and shift protests to a less densely populated area." (Doc. No. 38-10). In their Response, Defendants restate the two purposes articulated in the Amendment. First, they argue that by passing the Ordinance and Amendment "the City incentivized providers to locate clinics where the provider can provide both types of service, potentially own and control an entire parcel and, thus, control access to better protect its patients from protesters." (Doc. No. 43 at 17). Second, they claim that by limiting clinics in commercial areas to medication abortions (and not surgical abortions), the City hoped to minimize the disruption that protesters have caused in its commercial center. (*Id.*).

After reviewing the record before it, the Court finds these purported benefits are far too speculative to support Defendants' position. In *Adams & Boyle, P.C. v. Slatery*, ---F.3d----, 2020 WL 1982210 (6th Cir. April 24, 2020), the Sixth Circuit rejected the State's argument that barring doctors from performing abortion procedures for a three-week period as a result of the COVID-19

25

global pandemic would prevent the death of doctors, nurses, and first responders as "nothing more than the State's say-so." *Id.* at \*16 ("[T]he State has never, at any point in this litigation, attempted to support its policy choice with expert or medical evidence."). The Sixth Circuit also rejected as *ipse dixit*[19] the State's argument that its interest in halting the spread of COVID-19 is furthered by every abortion that is postponed and every item of PPE preserved from doing so. (*Id.* at \*16, \*19). The Sixth Circuit stated, "the State's proffered harm is purely speculative. As the district court noted, the State presented 'no evidence that any appreciable amount of PPE would actually be preserved if [the regulation] is applied to procedural abortions,' and the State has not remedied that shortcoming on appeal." (*Id.*). Similarly, Defendants here fail to provide any persuasive evidentiary support for the benefits that they claim the Ordinance and Amendment confer.[20]

First, Defendants' argument that the Ordinance and Amendment promote the health, safety, and welfare of women seeking abortions by protecting them from protesters stretches credulity. It is unclear to the Court how limiting surgical abortion clinics to an I-S or I-G industrial zone would enable the clinics to better protect the women seeking their services. And Defendants' suggestion the zoning regulation encourages abortion clinics to purchase and control their own pieces of property is baffling. Such a suggestion is far too attenuated and speculative. The Court has no reason, aside from Defendants' *ipse dixit*, to believe that clinics would be incentivized to purchase property in an I-G industrial zone merely because those plots permit clinics to perform both surgical and medication abortions. Nor have Defendants suggested or shown that clinics would be practically, financially, or legally able to do so. The Court likewise has no reason to believe that

---

[19] "'*Ipse dixit*' means a 'bare assertion resting on the authority of an individual.'" *United States v. Barnes*, 295 F.3d 1354, 1362 (D.C. Cir. 2002) (*Black's Law Dictionary* 961 (4th ed. 1968)).

[20] This fact dovetails with the Court's conclusion that, most likely, the promotion of such benefits was not the true purpose of the Ordinance's and Amendment's passage.

26

owning (rather than renting) property would in fact enable abortion clinics to protect the women seeking their services from protesters. Indeed, Defendants themselves recognize that the zoning regulation would merely "*shift* protests to a less densely populated area." (Doc. No. 38-10 (emphasis added)). In sum, they provide absolutely no evidence to establish a relationship between the state's purported benefit of promoting the health, safety, and welfare of women and the Ordinance and Amendment. And, under Supreme Court abortion precedent, the Court is under no obligation to uncritically defer to Defendants' unsupported assertions. *Hellerstedt*, 136 S. Ct. at 2310 (noting that uncritical deference to a legislature's factual findings regarding abortion is inappropriate).

Defendants' argument that the Ordinance and Amendment further the City's interest in preserving its economic growth is similarly unsupported. (Doc. No. 43 at 17-18). Defendants assert that "[t]he city has documented that protesters have disrupted operations at the adjoining hotel and the vacancy rates at the office buildings are concerning." (*Id.*). In support of this argument, they submitted the declaration of Kenny Martin, the head of economic development for the City. (Doc. No. 47). According to Martin, a Hampton Inn & Suites is located across the street from Carafem and a Residence Inn is currently being built to Carafem's south. Although Martin declares that protesters often occupy the public sidewalk in front of Carafem and the same sidewalk extends in front of the location where the new Residence Inn is being constructed, he states nothing that suggests either hotel has been "disrupted" by Carafem's presence. (*Id.* ¶¶ 3,4,6). Indeed, he does not even state that the protesters themselves have extended to the sidewalk in front of the new hotel. Regarding the vacancy rates, Martin declares that an internet search he ran revealed that 10,526/15,088 square feet of a building across the street from Carafem and 12,000/54,000 square feet of the Pavilion itself are currently up for lease. (*Id.* ¶¶ 7,8). Without more context, these

27

statistics are meaningless. Defendants have provided no evidence suggesting that these vacancy rates are a result of Carafem's presence. The Court does not know how long these properties have been vacant, when they became vacant, or whether these vacancy rates are typical of office spaces throughout the City. Nor is the Court persuaded by Martin's assertion that "[he] was concern[ed] that the opening of the abortion clinic would result in a loss of City revenues as the inevitable protests could lead to lower occupancy rates at nearby hotels and decreased occupancy rates in the offices in the area." (*Id.* ¶ 13). This "concern" says nothing about whether Carafem has in fact negatively affected the City's finances and is far too speculative to be given credence here. *See Adams & Boyle*, 2020 WL 1982219, at *10-11.[21] Defendants also submitted as evidence approximately twenty Computer Aided Dispatch Records related to calls for service in connection with protests in the vicinity of Carafem's clinic. (Doc. No. 44-1). As an initial matter, the content in these reports is very sparse, consisting of just a few words per report, and therefore of little value to the Court. In addition, from what the Court can tell from this limited content, these complaints were almost exclusively minor incidents requiring at most assistance from security guards at the Pavilion. Finally, the frequency of the reports says nothing about the protests' effect on the economic growth of Mt. Juliet. The majority of the reports occurred within the first month after Carafem opened. (Doc. No. 44-1 (five reports occurring in March 2019)). After that, the reports became far more sporadic, including one report in May 2019, none in June, and one in each month

---

[21] Defendants argument that Carafem's presence threatens the City's economic growth is further called into question by evidence submitted by Plaintiff that Mt. Juliet has received significant investment since Carafem opened, including an Amazon facility expected to create up to 2,000 jobs. (Doc. No. 38 at 20 (citing Doc. No. 38-1 ¶ 42)).

28

for the rest of 2019. (*Id.*).  Accordingly, they do not advance Defendants' argument that surgical abortions in districts other than I-S or I-G zones threaten the economic growth of Mt. Juliet.[22]

Defendants also assert that the Ordinance and Amendment would result in protests being moved to a less (economically, at least) disruptive location by ensuring that (now newly authorized) surgical abortions be performed only outside of the commercial district. (Doc. No. 12 at 12).  But Defendants have not provided any evidence, or persuasive argument, in support of this assertion. Under the City's zoning regulations, Carafem thus far has been allowed to perform medication abortions at its clinic in the Providence Medical Pavilion, a I-C zoned district. Defendants do not argue, much less provide evidence demonstrating, that protesters are active only outside of clinics performing surgical (as opposed to medication) abortions. To the contrary, Defendants recognize that protestors have been active outside of Carafem, even though it has been performing only medication abortions. (Doc. No. 43 at 12). Furthermore, Plaintiff has provided evidence by way of declaration that both before and after the Ordinance's passage "regular groups of protestors [] congregate near [Carafem's] parking lot." (Doc. No. 38-1 ¶ 40).

Again, the Defendants' unsupported assertions (which are challenged and contradicted by Plaintiff's evidence) do not compel the Court to forgo its own inquiry regarding the legitimacy of the City's purported benefits. *See Adams & Boyle*, 2020 WL 198221, at *10-11; *Planned Parenthood of Ind. & Ky., Inc. v. Adams*, 937 F.3d 973, 983 (7th Cir. 2019) ("In the face of evidence of burdensome effects, it is not enough for the [City] merely to recite its interests and to claim the new law will serve those interests or to say it is only experimenting.").

_____

[22] The Court's firm conviction that these reports do not support Defendants' position is reinforced by the fact that Defendants themselves do not cite to them in their Response. Rather, they merely attach the reports as an exhibit without explaining their significance or how they advance Defendants' position.

Finally, Plaintiff suggests, and the Court agrees, that "Defendants' purported goal of "shift[ing] protests to a less densely populated area," is a legally impermissible basis to restrict abortion." (Doc. No. 38 at 17-18). First, as the Court recognized above, this is America, and just as officials are entitled to their freedom of conscience, protesters are entitled to their freedom of speech. In this nation, non-violent protests (including of abortion) are not discouraged, as Defendants surely can appreciate; thus, to the extent the City's claimed objective is ultimately to reduce (rather than merely shift the location of) the protesting, it is inappropriate. Additionally, if shifting or reducing protests were a permissible basis upon which to restrict abortion, those who oppose abortion could simply protest and have clinics rezoned at their will to the extent city officials found the protests at the current clinic site simply too problematic. This, Plaintiff argues, amounts to a heckler's veto. As discussed in *Roe v. Crawford*, 514 F.3d 789, 796 (8th Cir. 2008), "the 'heckler's veto' involves situations in which the government attempts to ban protected speech because it might provoke a violence response. In such situations, 'the mere possibility of a violent reaction to [protected] speech is simply not a constitutional basis on which to restrict [the] right to speak.'" *Id.* at 796 n.3 (internal citation omitted). The Court understands and agrees with the analogy. The prospect of protests is not a permissible basis upon which to restrict a women's access to an abortion. In response, Defendants argue that "numerous courts have held that a municipality's concerns about property values and surrounding economic development are valid and constitute a rational basis for enactment of a zoning ordinance." (Doc. No. 43 at 18). However, none of the cases Defendants cite concern either protests or abortion. Thus, they are irrelevant here.

Accordingly, the Court finds that the evidence weighs against Defendants' argument that the Ordinance and Amendment provide any valid benefit to the City. To the contrary, the lack of

30

evidence supports the conclusion that the zoning requirements mandated by the Ordinance and Amendment have such a tangential relationship to the asserted benefits to be arbitrary.

On the other hand, Plaintiff has provided evidence indicating that the "Ordinance [and Amendment] places substantial burdens on access to abortion by barring the lone provider within city limits from performing surgical abortions." (Doc. No. 38 at 13). As indicated above, the record reflects that subsequent to 11 weeks after the last menstrual period, surgical abortion is the only option for a woman seeking an abortion; this means that a prohibition of surgical abortions is a prohibition of *all* abortions after 11 weeks, well within the pre-viability time-frame. It is undisputed that the Ordinance and Amendment prevent Carafem from providing surgical abortions in its current location, meaning that it prevents Carafem from providing any abortions at its current location after 11 weeks. Further, Carafem argues that it would be "cost prohibitive" for it to open a facility in a zone where a Surgical Abortion Clinic is permitted to operate. (Doc. No. 38 at 14).

Therefore, according to Plaintiff, women who seek to exercise their right to an abortion and require the surgical procedure have three choices: (1) they can travel hundreds of miles round-trip to access abortion elsewhere; (2) they can delay care for weeks while attempting to obtain an abortion at Planned Parenthood Nashville; or (3) they can forego an abortion altogether. (*Id.*). "Each of those 'options' is unduly burdensome," Plaintiff contends. (*Id.*).

In support of its assertion, Plaintiff relies upon the declarations of (1) Melissa Grant, the Chief Operations Officers of Carafem (Doc. No. 38-1); (2) Sheila M. Katz, Ph.D., an expert specializing in gender and poverty (Doc. No. 38-16); and (3) Aileen Gariepy, M.D., a physician specializing in Obstetrics and Gynecology (Doc. No. 38-15).[23]

---

[23] Defendants contend that Plaintiff's argument is based on its expert's speculation and is therefore insufficient to support the undue burden analysis. (Doc. No. 43 at 21). The Court disagrees for two reasons. First, Plaintiff has provided evidence, by way of declaration, that it has had to turn away

31

In her declaration, Grant provides a wide range of information pertaining to Carafem's operations, the effect of the Ordinance and Amendment on Carafem, and the effect of the Ordinance and Amendment on people seeking surgical abortions in Tennessee. (Doc. No. 38-1). Grant also provided information regarding the current capacity issues at Planned Parenthood Nashville, stating that "[s]ince [C]arafem opened, more than 40 patients have reported that Planned Parenthood-Nashville referred them to [C]arafem's Mt. Juliet clinic because it did not have availability to see them." (Doc. No. 38-1 ¶ 29). To that point, Grant further stated,

> I know from my staff having spoken to patients who tried to schedule appointments at Planned Parenthood, as well as from my staff's attempts to refer surgical abortion patients to Planned Parenthood, there is a 2-3 week wait time—at a minimum—for a patient to obtain a surgical abortion at Planned Parenthood's Nashville health center. As recently as September 2019, representatives for Planned Parenthood testified that there was a 3-4 week wait for a surgical abortion at its Nashville facility. *See Adams & Boyle P.C. v. Slatery*, No. 3:15-cv-00705, Trial Transcript Vol. 2, at 97:1-24.

(*Id.* ¶ 30). The Grant Declaration also touches upon the difficulties of opening a new clinic or relocating to an I-G industrial zone. (*Id.* ¶ 37 ("Much of the area where a surgical abortion clinic is permitted under the amended ordinance consists of undeveloped tracts of land. Even if [C]arafem could even find someone willing to sell or lease this land to an abortion provider, the costs of building a clinic from the ground-up would far exceed what [C]arafem could afford."); *id.* ¶ 38 ("Being forced to move offices would also impose a significant financial burden on [C]arafem, including the costs of retrofitting a second office space so that it could provide surgical abortions in one of the few permitted areas in Mt. Juliet. Indeed, [C]arafem has already incurred

---

women seeking surgical abortions. (Doc. No. 38-1 ¶ 26). Such evidence is not speculative. Second, the type of evidence submitted by Carafem's expert is often considered by district courts. *See Planned Parenthood of Indiana & Kentucky*, 896 F.3d at 819 (noting that the district court considered testimony of the providers expert in gender studies, poverty, and low-wage labor markets regarding the "impact of the new law on [] interconnected stressors and on the already precarious financial lives of poor women seeking an abortion").

significant expenses, including promotional expenditures, to develop its existing location, and has several years remaining on its lease at the Providence Medical Pavilion.")).

In her declaration, Katz provides her opinion as an expert in gender and poverty sociology regarding the impact of travel on poor and low-income women seeking abortions. (Doc. No. 38-16 ¶¶ 29-30).[24] Factoring in the information provided in the Grant Declaration regarding the Nashville clinic's capacity constraints, the Katz Declaration states the following:

> [A] woman in the Nashville metro area in need of a surgical abortion who is unable to get one of the limited appointments at [Planned Parenthood Nashville] would be forced to travel hundreds of miles round-trip to obtain care from her next-closest provider. The next-closest provider of such services is in Knoxville, Tennessee, a journey of 325 miles roundtrip. And she would have to make that journey twice, or pay for lodging to stay two or more nights in Knoxville, because, as I understand it, Tennessee requires multiple in-person visits to the clinic separated by at least 48 hours before a woman can obtain an abortion. If the provider in Knoxville did not have capacity, the woman may have to travel even further—e.g., over 450 miles round-trip to Memphis, Tennessee or 500 miles round-trip to Atlanta, Georgia.

(*Id.* ¶ 27).

Finally, the Gariepy Declaration provides opinion testimony, based on Gariepy's education, training and practical experience as an OB/GYN with subspecialty training in abortion and contraception, regarding, *inter alia*, (1) women's options for seeking to end their pregnancies; (2) the safety of surgical abortions; and (3) health and safety risks created when abortions are less accessible. (Doc. No. 38-15). In particular, Plaintiff relies on Gariepy's declaration that some women are not eligible for a medication abortion because their pregnancy has progressed past 10-11 weeks or because they are not medically eligible. (*Id.* ¶¶ 19-20 ("[M]edication abortions are contraindicated for patients who have an IUD in place, or various medical conditions, including allergies to mifepristone or misoprostol; current long-term use of systemic corticosteroid therapy;

---

[24] Even if traveling to obtain an abortion ultimately would prove feasible for women, including women of little means, such travel nevertheless does impose a burden, and, depending on the circumstances, a significant one.

33

bleeding disorders such as anemia, porphyria, or clotting disorders; certain cardiovascular diseases, such as uncontrolled hypertension, angina, valvular disease, arrhythmia, or cardiac failure. Other contraindications include severe liver, kidney or lung disease, or an uncontrolled seizure disorder."). Plaintiff also cites to Gariepy's Declaration in support of its assertion that lengthy wait times to obtain abortion services increase the risk of harm to women seeking abortions. (*Id.* ¶ 32 ("Although abortion procedures are extremely safe throughout pregnancy, the risks and complications generally increase with gestational age. 'As the pregnancy progresses, there is an increase in the skill required for the procedure, level of sedation or anesthesia, and the risk of complications. Thus, delaying the abortion increases the risk of harm to the woman.'" (citing The Safety and Quality of Abortion Care in the United States, NATIONAL ACADEMIES OF SCIS., ENG., AND MED. (March 2018) ("National Academies"), page 77-78)).

Defendants dispute that the Ordinance and Amendment unduly burden women obtaining abortion services. First, Defendants argue that Carafem's assertion that it would be cost prohibitive to move to an I-G zone is irrelevant to the undue burden analysis. (Doc. No. 43 at 20). Defendants point out that "Carafem provides no authority to support its position that the undue burden analysis considers an abortion provider's bottom line." (*Id.*). In its reply, however, Plaintiff cites the Supreme Court's decision in *Hellerstedt*, which factored into its undue burden analysis "the costs that a currently licensed abortion facility would have to incur to meet the surgical-center requirements[.]" *Hellerstedt*, 136 S. Ct. at 2318. The Court found that the significant expenses that would be required "supports the conclusion that more surgical centers will not soon fill the gap when licensed facilities are forced to close." *Id.* Considering these expenses, the Court "assumed that the facilities would close rather than be able to meet the requirements, despite the fact that each facility could, in an alternate universe where resources were unlimited, simply make the

changes." *Planned Parenthood of Indiana & Kentucky*, 896 F.3d at 824 (discussing *Hellerstedt*). Accordingly, Plaintiff's argument—supported by the Declaration of Melissa Grant (Doc. No. 38-1)—that it is cost-prohibitive for Carafem to attempt to relocate to either of the two I-G zoned areas (because one of the zones is a vacant plot of land and neither such area contains medical office facilities) is relevant to the Court's undue burden inquiry. The Court will also consider that Carafem has "incurred significant expenses, including promotional expenditures, to develop its existing location, and has several years remaining on its lease at the Providence Medical Pavilion." (Doc. No. 38-1 ¶ 37). Indeed, this supports the conclusion that, absent relief from the Court, (1) Carafem will not relocate and therefore will not provide surgical abortions in Mt. Juliet, and (2) other Surgical Abortion Clinics are unlikely to relocate to an I-G zoned area.

Second, Defendants challenge Carafem's "characterization that the Ordinance requires women to travel hundreds of miles to obtain a surgical abortion." (Doc. No. 43 at 21). According to Defendants, women seeking to obtain a surgical abortion should be able to receive treatment in Nashville. (*Id.*). However, as the Seventh Circuit stated in *Planned Parenthood of Indiana & Kentucky, Inc. v. Comm'r of Indiana State Dep't of Health*, "[c]ourts are bound by the reality in which the laws operate." 896 F.3d at 824. Indeed, Defendants do not dispute that the Planned Parenthood of Nashville is currently experiencing capacity constraints and lengthy wait times. (Doc. No. 43 at 21 (speculating that the opening of a second abortion clinic in Kentucky should alleviate some of the stress currently burdening the Nashville clinic)). Also to be factored into this equation is Tennessee's two-visit rule, which requires that a woman seeking an abortion make at least two visits to the doctor. (Doc. No. 50 at 3 n.4). In light of these realities, the Court is persuaded that women seeking abortions must either endure extensive wait times at the Nashville Clinic or drive hundreds of miles round-trip to Knoxville, Memphis, or Atlanta. And, as precedent has

established, lengthy delays and the requirement to travel long distances are particularly burdensome. *See Casey*, 505 U.S at 885-86 (describing the delay caused by a 24-hour waiting period "close[]," and finding "troubling" the potential for such a policy to prevent low-income women from seeking an abortion); *Hellerstedt*, 136 S. Ct. at 2318 (finding unduly burdensome a Texas law that, while not furthering women's health, "forced women to travel long distances to get abortions in crammed-to-capacity superficialities"); *Adams & Boyle*, 2020 WL 1982210, at *8-9 (finding a three-week delay due to COVID-19 unduly burdensome).

Third, Defendants argue that because the Ordinance and Amendment does not impact medication abortion patients, it does not impose an undue burden "in a large fraction of the cases in which [it] is relevant" under *Casey's* large fraction test. (Doc. No. 43 at 21-22). In so arguing, Defendants overlook the qualifying language: "in which it is relevant." Plaintiff has provided sufficient evidence and Defendants do not dispute that certain women are not candidates for medication abortion, including "those who are past 11 weeks from their last menstrual period; those with medical contraindications; and those with work, school, or caregiving obligations that are not compatible with the time it takes to pass the pregnancy at home during a medication abortion." (Doc. No. 38-1 ¶ 26). For this reason, Defendants' citation to *Planned Parenthood S.W. Ohio Region v. DeWine*, 696 F.3d 490 (6th Cir. 2012) is misplaced. In *DeWine*, the Sixth Circuit denied the plaintiff's motion for a preliminary injunction, finding that a law banning the use of a medication abortion-inducing drug called mifepristone for women between 50 and 63 days from their last menstrual period did not create a substantial obstacle for a large fraction of women in deciding whether to have an abortion. *DeWine*, 696 F.3d at 515-16. The Sixth Circuit arrived at this conclusion after considering evidence demonstrating that the women affected by the ban proceeded to obtain a surgical abortion even though they would have preferred a medication

36

abortion. *Id.* Here, the Court finds that women who have the option of electing to have a medication abortion are not relevant to the large fraction inquiry. Rather, the relevant denominator is women who are not candidates for medication abortion, including those who are past 11 weeks from their last menstrual period and those with medical contraindications. And, as discussed above, the Ordinance and Amendment effect 100 percent of those women.[25] *See Hellerstedt*, 136 S. Ct. at 2320 (finding that the relevant denominator to determine whether a large fraction of women are affected by an abortion law is "those [women] for whom [the provision] is an actual rather than an irrelevant restriction"). Based on the record and consistent with the foregoing analysis, the Court finds that the Ordinance and Amendment likely pose a substantial obstacle to women seeking abortions. And because the Ordinance and Amendment likely do not further a valid state interest, the Court finds that Plaintiff has shown a strong likelihood of success on the merits of its claim that the Ordinance and Amendment impose an "undue burden" on a women's right to choose to have a pre-viability abortion.

## B. Equal Protection

Plaintiff's likelihood of success on the merits of its due process claims alone supports the issuance of the requested preliminary injunction. Nevertheless, the Court will proceed alternative to address the likelihood of Plaintiff's success on the merits of its equal protection claim.

Plaintiff also argues that it is likely to succeed on its claim that the Ordinance and Amendment violate its right to equal protection of the laws. The Equal Protection Clause of the Fourteenth Amendment "prohibits discrimination by government which either burdens a fundamental right, targets a suspect class, or intentionally treats one differently than others

---

[25] Defendants also argue that "[t]he regulation in this case is akin to the burdens imposed by the Ohio legislature in Baird."

37

similarly situated without any rational basis for the difference." *Bench Billboard Co. v. City of Cincinnati*, 675 F.3d 974, 986 (6th Cir.2012) (quoting *TriHealth, Inc. v. Bd. of Comm'rs*, 430 F.3d 783, 788 (6th Cir.2005)).

According to Plaintiff, the Ordinance and Amendment violate the Equal Protection Clause for the same reasons that it fails the purpose prong of the undue burden test, "there is no legitimate basis for the Ordinance, which improperly distinguishes between surgical abortions and numerous comparable medical procedures." (Doc. No. 38 at 21). Plaintiff argues that the Ordinance and Amendment are subject to strict scrutiny because abortion is a fundamental right, but that it is likely to succeed on its claim regardless of the level of scrutiny the Court applies. In response, Defendants urge the Court to apply the rational basis test to Plaintiff's equal protection challenge. Under that test, Defendants contend, Plaintiff's equal protection claim fails because the City has provided "substantial reasons for the Zoning Regulations applicable in this case." (Doc. No. 43 at 24). "Under the rational basis test, a statutory classification violates the Equal Protection clause, if it 'rests on grounds wholly irrelevant to the achievement of [any governmental] objective.'" *Ledesma v. Block*, 825 F.2d 1046, 1051 (6th Cir. 1987) (quoting *McGowan v. Maryland*, 366 U.S. 420, 425 (1961)). In other words, a law must further a legitimate state interest in order to be upheld under rational basis analysis. *See id.*

Based on the Court's findings above(at pages 13-23), the Ordinance and Amendment likely was intended to serve a government interest that, under *Casey* and its progeny, is not legitimate. And to the extent that the Court should accept, for purposes of this analysis, that the City had the interests it now claims to have, that would not change the result; even assuming *arguendo* that at least some of those interests are legitimate, as explained above (at pages 25-31), the Ordinance and Amendment are, based on the current record, likely wholly irrelevant to those interests.

38

Accordingly, the City likely lacked any rational basis for distinguishing Surgical Abortion Clinics from other kinds of clinics performing outpatient surgical procedures.[26] Because the Court finds that the Ordinance and Amendment cannot satisfy the rational basis test, it need not address a strict scrutiny analysis. *See Planned Parenthood of Greater Ohio v. Hodges*, 188 F. Supp. 3d 684, 694 (S.D. Ohio 2016). And because the Ordinance and Amendment likely bear no rational relationship to the City's stated interest, the Court concludes that Plaintiff has established a strong likelihood of success on the merits of its Equal Protection claim.

2.  Irreparable Harm

Plaintiff has shown that enforcement of the Ordinance and Amendment causes women seeking surgical abortions irreparable harm. "[A] plaintiff can demonstrate that a denial of an injunction will cause irreparable harm if the claim is based upon a violation of the plaintiff's constitutional rights." *Overstreet*, 305 at 578; *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of [constitutional] freedoms ... unquestionably constitutes irreparable injury."); *see also Planned Parenthood Ass'n of Cincinnati v. City of Cincinnati*, 822 F.2d 1390, 1400 (6th Cir.1987) (finding irreparable injury where plaintiff has shown substantial likelihood of success on merits of constitutional challenge to abortion regulation). As the Court has found that the Ordinance and Amendment likely create an undue burden to a "large fraction" of women seeking an abortion, Plaintiff has shown the requisite irreparable harm.

---

[26] The Court recognizes that the rational basis test is not especially difficult one for ordinances to satisfy. But as should be clear by now, the Court is of the view that the Ordinance and Amendment were not intended to serve the objectives that Defendants now claim was served by the Ordinance and Amendment. In a situation involving this kind of dissonance, it is for obvious reasons much harder to satisfy the rational basis test.

39

3. Substantial Harm to Defendants and Others

"The third factor for a court to consider is 'whether the issuance of the injunction would cause substantial harm to others." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 550 (6th Cir. 2007). "In considering this factor, the Court must (1) balance the harm [p]laintiff would suffer if its request for a preliminary injunction were denied against the harm [d]efendant would suffer if an injunction were to issue, and (2) assess the impact the preliminary injunction might have on relevant third parties." *Procter & Gamble Co. v. Georgia–Pacific Consumer Prods. LP*, No. 1:09–318, 2009 WL 2407764, at *10 (S.D. Ohio Aug. 3, 2009); *accord Trenton Corp. v. Superior Corrosion Control, Inc.*, No. 06–15699, 2007 WL 268792, at *6 (E.D. Mich. Jan. 25, 2007).

As discussed above, Plaintiff has shown that the Ordinance and Amendment likely deprive women seeking surgical abortions of their constitutional rights. And, because the Court has found that the City likely does not actually derive any benefit from the law's implementation, the City is not harmed by the preliminary enjoining of the Ordinance and Amendment. *See, e.g.*, *Planned Parenthood Ass'n of Cincinnati*, 822 F.2d at 1400 (holding that there was no substantial harm in preventing city from enforcing ordinance that was likely to be found unconstitutional, as the state has no valid interest in enforcing an unconstitutional ordinance). Accordingly, the substantial-harm factor favors Plaintiff.

4. Public Interest

Finally, Plaintiff argues that "[n]either the city nor the public have an interest in the enforcement of unconstitutional laws." (Doc. No. 38 at 25). The Court agrees. "The public interest is promoted by the robust enforcement of constitutional rights," *Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp.*, 698 F.3d 885, 896 (6th Cir. 2012), and "absent medical

or other legitimate concerns[,]" it is in the public's interest to uphold those rights if they are being denied. *Doe v. Barron*, 92 F. Supp. 2d 694, 697 (S.D. Ohio 1999). Because the record at this juncture supports that the Ordinance and Amendment create an undue burden to a large fraction of women seeking a pre-viability surgical abortion, a preliminary injunction serves the public interest.

## CONCLUSION[27]

In the United States, individuals are generally free to oppose the practice of abortion, hope that women do not choose to have an abortion, work towards minimizing the frequency of abortion in the community, hope for a change in the Supreme Court's substantive due process jurisprudence regarding abortion, and so forth. And states and municipalities can impose relatively broad post-viability restrictions on abortion rights, as well as pre-viability restrictions that do not amount to what precedential case law has called or would call an undue burden. But under that undue burden standard, states and municipalities cannot do what, based on the current record, the City likely did here: enact an ordinance (as amended) that had the purpose, and alternatively the effect, of placing a substantial obstacle in the way of women seeking abortions (including pre-viability abortions) in Mt. Juliet. Given the substantial likelihood that the Ordinance and Amendment violates substantive

---

[27] Plaintiff requests that the Court waive the bond requirement of Fed. R. Civ. P. 65(c), and Defendants do not oppose this request. Rule 65(c) provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Yet, "the rule in [the Sixth Circuit] has long been that the district court possesses discretion over whether to require the posting of security." *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995). When determining whether to require the party seeking an injunction to give security, courts have considered factors such as the strength of the movant's case and whether a strong public interest is present. *Id.* at 1176. Under the circumstances of this case, the Court finds that a bond is not required from Plaintiff.

due process under *Casey* and its progeny, it follows that irreparable injury is likely and that the two other preliminary injunction factors also cut in Plaintiff's favor.

For the foregoing reasons, the Court will **GRANT** Carafem's Amended Motion for Preliminary Injunction. In making this determination based on the current record, the Court does not suggest that Carafem necessarily will prevail at trial or that any decision here constitutes any law of the case. *See Cold Heading Co. v. B&D Thread Rolling, Inc.*, No. 2:11-CV-15189, 2012 WL 13008688, at *13 (E.D. Mich. June 5, 2012), *adopted by*, No. 11-15189, 2012 WL 13012405 (E.D. Mich. July 19, 2012); *Bronson v. Board of Educ. of the City Sch. Dist. of Cincinnati*, 550 F. Supp. 941, 945 (S.D. Ohio 1982) ("[B]ecause the nature of findings made in connection with a preliminary injunction are inherently tentative, it is apparent, under established authority, that findings made on motions for preliminary injunctions do not estop the parties at the trial on the merits, and are neither determinative of the issues in the case, nor binding upon the parties or the [c]ourt at a subsequent trial.").

An appropriate order will be entered.

*Eli Richardson*

ELI RICHARDSON
UNITED STATES DISTRICT JUDGE